Edward BRUCKER et al., Plaintiffs,

v.

THYSSEN–BORNEMISZA EUROPE N.V. et al., Defendants.

William B. WEINBERGER, Plaintiff,

v.

Richard J. POWERS et al., Defendants.

SHAMROCK CORPORATION, Individually and on behalf of all holders of Common Stock and Warrants of Indian Head, Inc., similarly situated, Plaintiffs,

v.

INDIAN HEAD, INC., et al., Defendants.

Nos. 74 Civ. 5755, 75 Civ. 229 and 75 Civ. 1736.

United States District Court,
S. D. New York.

Nov. 15, 1976.

Austrian, Lance & Stewart, P. C., New York City, Lead Counsel for plaintiffs; by William Klein II, Keith A. Taylor, New York City, of counsel.

Weinstein & Levinson, New York City, for plaintiff Weinberger by Frank Weinstein and Lawrence Sucharow, New York City, of counsel.

Wolf, Haldenstein, Adler, Freeman, Herz & Frank, New York City, for plaintiff Shamrock by Donald M. Landis, Harvey M. Sklaver, New York City, of counsel.

Shearman & Sterling, New York City, for defendants Thyssen-Bornemisza Europe N.V., Thyssen-Bornemisza, Inc., White, Weld & Co. Inc., Herbert E. Bachrach, Gerard B. Huiskamp, H. H. Thyssen-Bornemisza, R. L. Genillard by Robert S. Blanc, III, Arne Hovdesven, New York City, of counsel.

Richard J. Cutler, New York City, for defendant Indian Head, Inc.

Cravath, Swaine & Moore, New York City, for defendants James G. Ferguson, James M. Flack, Andrew Kalman, Paul W. McAlister, John E. O'Sullivan, Richard J. Powers, James E. Robison, Robert M. Schwarzenbach and Marshall F. S. Smith by Robert Rosenman, Anthony A. Dean, New York City, of counsel.

Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for objectors by Edwin P. Rome, Philadelphia, Pa., of counsel.

## MEMORANDUM

STEWART, District Judge:

Before the Court is an application pursuant to Rule 23 of the Federal Rules of Civil Procedure for approval of a proposed settlement. Counsel for both plaintiffs and defendants have submitted well documented papers in support of the proposed settle-

ment. Objectors have presented papers in response, and have been heard at hearings before this Court on October 13 and 18, 1976. Upon a detailed review of the arguments and documents submitted by all parties, it is the Court's conclusion that the settlement is fair and reasonable and should be approved.

Indian Head is a diversified American company which in 1973 had approximately 5,425,000 shares of common stock outstanding.[1] The common stock was listed on the New York Stock Exchange. Warrants were issued and outstanding pursuant to a 1965 agreement, and were listed on the American Stock Exchange.[2] $25,000,000 of 5½% convertible subordinated debentures due April 15, 1993, (in denominations of $1,000) were also issued and outstanding subject to the terms and conditions of an Indenture dated April 15, 1968, between Indian Head and Marine Midland Grace Trust Company of New York as Trustee ["Indenture"].

Thyssen-Bornemisza Europe, N.V. ["TBE"] is an international industrial holding company with headquarters in the Netherlands. In September, 1973, pursuant to a Memorandum of Understanding between TBE and Indian Head,[3] TBE made a tender offer at $27 a share, and acquired approximately 33.9% of the common stock,[4] although initially it had offered to buy only between 26% and 32%.

Prior to the tender offer, the New York Stock Exchange had indicated to Indian Head and TBE that ownership by TBE of over 32% would probably result in delisting the common stock. This information was included in the statutory notice to shareholders.[5] In paragraph 9 of this same notice to shareholders, TBE disclaimed any present intention to acquire control of Indian Head.

1. It also had 649,000 shares reserved for issuance to the convertible debenture holders pursuant to their conversion rights, and 111,667 shares reserved for the conversion of preferred shares.

2. "Each Warrant is issued pursuant to the Warrant Agreement with the Chemical Bank of New York as Warrant Agent ("CHEMICAL"), and entitles the holders through May 15, 1990 to purchase one share of common stock, or an aggregate of 400,000 shares, at the following exercise prices: $20 per share if exercised before the close of business on May 15, 1970; $25 per share to May 15, 1975; $30 per share to May 15, 1980; $35 per share to May 15, 1985; and $40 per share to May 14, 1990;" Plaintiffs' affidavit p. 23.

3. Indian Head agreed in the Memorandum of Understanding to 1) sell TBE 750,000 shares of Indian Head's authorized but unissued common stock at $27 per share; 2) cooperate with TBE in the first tender offer; 3) elect to the Indian Head Board of Directors Huiskamp (Chairman of TBE's Board of Management) and Bachrach (a member of TBE's Board of Management and director of its Corporate Planning and Development), and to make one a member of the Executive Committee and one a member of the Finance Committee. TBE agreed to buy from the Directors of Indian Head up to 50,000 of their shares, and to name Robison (Indian Head's former president) to the TBE Supervisory Board (which makes TBE policies), if the tender offer succeeded.

4. TBE's initial offer was to purchase from the public between 750,000 and 1,100,000 shares of common stock, in addition to 750,000 to be purchased directly from Indian Head's authorized but unissued stock. This would have given them 26% to 32% of the stock. At the expiration of the offer 1,213,619 shares had been tendered, and although this was slightly in excess of the number of shares TBE sought, TBE states that it agreed to purchase all shares tendered in order not to disappoint the tendering stockholders (Defendants' Joint Memorandum in Support of Proposed Settlement, p. 3) ["Defendants' Memorandum in Support"].

5. ". . . if the ownership by TBG (later changed to TBE) of Indian Head common stock should arise above 32% (30%, if 30% or less is purchased pursuant to this offer and the agreement referred to above) such additional ownership might ultimately result in the delisting of Indian Head common stock from the Exchange. TBG has expressed to Indian Head its commitment that it will consult with Indian Head before taking any action, other than the transactions described in this offer, which would increase TBG's ownership of Indian Head common stock beyond 30% of the outstanding shares. Delisting could also result if the number of persons holding at least 100 shares of Indian Head common stock (Approximately 4,000 at the present time) should fall below 1,200." (Plaintiffs' Exhibits in support of settlement, Exhibit 24, ¶ 13) ["Plaintiffs' Exhibits"].

Except to the extent described above, it is not the present intention of TBE to attempt to acquire control of Indian Head by means of these transactions, nor in its capacity as a major stockholder of Indian Head does TBE now have or intend to develop plans or proposals to liquidate Indian Head, to sell its assets or to merge it with any other person or to make any change in its business, management or corporate structure. TBE does intend to vote its shares in a manner which is intended to benefit all of the stockholders of Indian Head, including TBE. (Plaintiffs' Exhibit 24.)

Indian Head's management made no recommendation to its shareholders with respect to this first tender offer—though it did state in the notice that it cooperated with TBE in making the offer (it made available a list of shareholders).

No notice of this first tender offer or of the possible delisting of the common stock was sent to the debenture holders, warrant holders or preferred share holders. However, the 1973 Annual Report did refer to the tender offer and the resulting acquisition of the stock.

In July, 1974, TBE made a second tender offer to buy all remaining Indian Head common stock, (again at $27 a share), and all outstanding warrants at $2.25 per warrant. This second tender offer was financed by a $50,000,000 long-term revolving credit agreement with the Chase Manhattan Bank, N.A. and fourteen other banks located outside the United States. Plaintiffs claim that these financial arrangements were made just nine weeks after the first tender offer (although the second tender offer was not to take place for 7 more months), and thus supports an inference that TBE's statement in its first tender offer that it did not intend to liquidate Indian Head, sell it, or merge it, was false and misleading. The defendants dispute this claim.

The notice to shareholders of the second tender offer disclosed, among other things:

the financing arrangements for the offer (Plaintiffs' Exhibit 45, ¶ 11); that Indian Head's Board of Directors and management made no recommendation, although they had cooperated with TBG (later changed to TBE) (*Id.* ¶ 12); the number of shares each member of the Indian Head Board was going to tender or retain (*Id.*); that as a result of the 1974 tender offer the common stock might no longer meet the requirements of the New York Stock Exchange for continued listing and the Exchange might delist the shares (*Id.* ¶ 13); that TBG intended to acquire control of Indian Head, but did not have any present plans to sell its assets or merge. The notice also stated:

TBG expects to purchase a substantial majority of the common stock as a result of this offer and thereby acquire control of the Company. TBG believes the Company to be well managed and to present an attractive long-term investment opportunity. TBG presently does not have any plans or proposals to make any major changes in the Board of Directors, management, corporate structure, operating policies or business of the Company or to suggest its liquidation, the sale of its assets or a merger with any other person. However, it reserves the right to make changes in the future should it determine that the best interests of the Company and its stockholders are served thereby. (*Id.* ¶ 9).

No copy of this notice was sent to the registered convertible debenture owners.

As a result of this second tender offer, TBE's total ownership of common stock increased to approximately 90.6%. They also obtained about 8% of the outstanding warrants. Shortly after the tender offer, the New York Stock Exchange delisted Indian Head's common stock and convertible debentures, and thereafter they were traded over the counter.

The three class action lawsuits involved in this settlement were brought, as a result of these two tender offers, against TBE, Indian Head, TBI,[6] Marine Midland, Trus-

---

**6.** A Maryland corporation which is a wholly-owned subsidiary of TBE, formed for the ex- press purpose of acquiring Indian Head's stock and warrants.

tee for the Debentures, Chemical Bank, warrant agent, White, Weld & Co., Inc., Indian Head's investment advisor, and various individual defendants who are or were officers and directors of Indian Head.[7] The Complaints in all three actions alleged violations of the Williams Act § 14(d) and (e)[8] and § 10b of the Securities Exchange Act of 1934[9] and Rule 10b–5 promulgated thereunder. The convertible debenture owners claim that the failure to send them notice was a violation of the Act and prevented them from favorably exercising their conversion rights. They also claim that TBE's acquisition of control constituted a constructive merger in violation of the Indenture. The warrant owners claim the tender offers were false and misleading. Both the Brucker and Shamrock Complaints also allege a common law breach of fiduciary obligations.

The defendants moved either for dismissal of the Complaints or for summary judgment, and the plaintiffs cross-moved for summary judgment. These motions were *sub judice* on February 12, 1976, when TBE announced a proposed "short-form" merger[10] of Indian Head into a TBE affiliate which was to take place on March 19, 1976.[11]

The Brucker plaintiffs moved to enjoin the merger through an amended class action complaint,[12] which was filed on behalf of all owners of warrants and common stock, as well as the debenture holders previously represented. On March 4, at the opening of the preliminary injunction hearing, the defendants announced that they were withdrawing the merger plan.

Subsequent to the announcement of the proposed merger, but prior to its withdrawal, the Court of Appeals for the Second Circuit issued opinions in *Marshel v. AFW Fabric,* 533 F.2d 1277 (2d Cir.), *vacated,* —— U.S. ——, 97 S.Ct. 228, 49 L.Ed. 162 (Oct. 12, 1976), and *Green v. Santa Fe Industries, Inc.,* 533 F.2d 1283 (2d Cir.), *cert. granted,* —— U.S. ——, 97 S.Ct. 54, 49 L.Ed.2d 74 (Oct. 5, 1976), which considerably changed the law as to short-form mergers and left many questions for future litigation. This uncertainty in the law led defendants to withdraw their merger proposal, and to negotiate with the plaintiffs, Transcript, First Settlement Hearing on October 13, 1976, at 22 ["1st Tr."].

A Stipulation and Agreement of Settlement was reached and signed by all the parties in late July. The Court then ordered, among other things, that the three actions should be maintained as class actions for purposes of settlement only, that a settlement hearing be held on October 13, and that a notice of this hearing and of the settlement terms be sent to all the members of the various classes, so that those who wanted to be excluded could opt out, and those who wanted to object could do so.

Two objectors appeared at the settlement hearings, Morton P. and Marjorie T. Rome, trustees of a trust which owns 25 deben-

---

**7.** *Edward Brucker, et. al. v. Thyssen-Bornemisza Europe, N.V., et al.,* 74 Civ. 5755 ["Brucker"] and *William Weinberger v. Powers, et. al.,* 75 Civ. 229 ["Weinberger"] were originally brought on behalf of convertible debenture owners of Indian Head. *Shamrock Corporation v. Indian Head, et. al.,* 75 Civ. 1736 ["Shamrock"] was brought on behalf of all holders of common stock and warrants of Indian Head.

**8.** 15 U.S.C. 78n *et seq.*

**9.** 15 U.S.C. 78j(b).

**10.** Under § 253 of the Delaware Corporation Law.

**11.** Under the proposed merger, the common shareholders would be paid $30 cash per share (compared to the $27 price of the tender offers), the convertible debentures could be surrendered for $779.22 cash, the conversion value at $30 per share (compared to the $701.30 tender offer conversion value) or held until maturity earning the regular interest payments but without the right to convert. The warrant owners were to receive nothing.

**12.** The amended complaint claimed that the merger plan constituted a redemption, and thus the debenture holders were entitled to $1,033, the redemption price, rather than the conversion price of $779.22.

tures, and Morris Shuldenrein,[13] owner of 7,500 warrants. Since most of the Romes' objections go to the scope of the settlement, and not its actual terms, we will defer discussion of their objections for the moment, and first discuss the fairness of the actual terms of the settlement.

The settlement agreement provides for the merger of Indian Head into a subsidiary of Thyssen-Bornemisza, Inc., ["TBI"]. Under the terms of the 32 million dollar settlement, the common stockholders will receive $32 a share upon the merger. The owners of the 5½% convertible subordinated debentures due in 1993,[14] have a number of options: 1) hold on to the debentures and collect the interest until 1993, at which time they can collect the $1000, 2) convert now at $32.50 a share, and receive $844.16 per $1000 debenture,[15] or 3) convert any time between the merger and 1993 and receive $32 per share (or $831.17 per $1000 debenture), a fixed cash sum.[16] In addition, former owners of Indian Head convertible debentures who held them on September 27, 1973,[17] and sold on or before July 1, 1974,[18] will receive up to $50 per debenture. Former owners of debentures who held them on July 2, 1974 and sold between July 12, 1974 [19] and August 2, 1976,[20] will receive up to $100 per debenture, the exact amount determined by the sales price.

As to the warrant holders, those who have owned warrants continuously from July 12, 1974 to the date of the merger will receive $4.00 per warrant. As to the warrant holders who have not owned their warrants continuously: owners on August 2, 1976, who still own on the date of the merger will receive $2.50 per warrant; owners of warrants on July 2, 1974, who sold their warrants between July 12, 1974, and August 2, 1976, will receive $1.50 per warrant. There will be no payment for any warrant sold between August 1, 1973, and July 1, 1974. In addition to the above amounts, TBI will pay all the expenses of administering the settlement and will pay up to $600,000 for counsel fees and expenses as awarded by the Court. Plaintiffs' attorneys agree to accept an award not to exceed $600,000.

◼ The general principles which guide the Court in assessing the fairness, reasonableness and adequacy of a class action settlement are clear.

. . . the role of a court in passing upon the propriety of the settlement of a . . . class action is a delicate one . . . since '[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation,' the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial.' Rather . . it must reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated' and 'form an educated estimate of the com-

---

**13.** Although Mr. Shuldenrein did not properly file his objection, the Court heard his statement and has considered his objection.

**14.** The convertible debentures are issued in face amounts of $1000 or integral multiples thereof, and are convertible into 25.974 shares of common stock per $1000 in principal amount.

**15.** This applies only to debenture owners who were owners on August 2, 1976 and who still own on the date of the merger.

**16.** As is apparent, those debenture holders who convert as part of the settlement will receive $.50 more per share than those who convert later. The difference is due to the fact that the

Indenture requires the debenture holder to receive what the common stockholders receive (here, $32 a share) in the case of a merger. Transcript, Second Settlement Hearing on October 18, 1976, p. 68 ["2d Tr."].

**17.** Date of the first tender offer.

**18.** On July 1, 1974, Indian Head requested suspension of trading of its stock. Trading was suspended from July 2 until July 12, 1974.

**19.** July 12, 1974, was the date of the second tender offer.

**20.** August 2, 1976, is the date the Order in the instant case was signed.

plexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.' *Newman v. Stein,* 464 F.2d 689, 691–92 (2d Cir.), *cert. den.,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) (citations omitted).

*Levin v. Mississippi River Corp.,* 59 F.R.D. 353, 361 (S.D.N.Y.1973). Some of the factors considered "relevant to a full and fair assessment" of the proposed settlement by the District Court, and approved by the Court of Appeals in *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 463 (2d Cir. 1972), were: 1) the complexity, expense and likely duration of the litigation; 2) the reaction of the class to the settlement; 3) the stage of the proceedings and the amount of the discovery completed; 4) the risks of establishing liability; 5) the risks of establishing damages; 6) the risks of maintaining the class action through the trial; 7) the ability of the defendants to withstand a greater judgment; 8) the range of reasonableness of the settlement fund in light of the best possible recovery; 9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. At the heart of the analysis the Court must evaluate the strength of the plaintiffs' case, considering both the likelihood of establishing liability and the consequent probable reward in damages. It must consider these factors in light of the terms of the settlement.

██ In the instant case, there are complicated questions of law on both the issues of liability and damages. While the role of a Court in determining the fairness of a set-

tlement is not to decide these issues, the Court should, and here does, take note of the fact that these complex questions of law are unresolved, thus making this case an appropriate one for settlement. One of the primary unresolved legal questions involves the interpretation and application of *Marshel, supra, Green, supra,* and *Merrit v. Libby, McNeil and Libby,* 533 F.2d 1310 (2d Cir. 1976) to the attempted short-form merger in this case, particularly in light of the fact that the Indian Head merger is distinguishable on its facts from each of the above cases. Thus the Court does not agree with the objectors' assertion that liability is clear with respect to issues arising from the short-form merger. This case also presents complex legal and factual questions on a variety of other issues, among them: whether or not the 1973 and 1974 tender offers were false and misleading in failing to disclose that TBE would merge Indian Head into an affiliate; whether or not under *Van Gemert v. Boeing,* 520 F.2d 1373 (2d Cir.), *cert. den.,* 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), Indian Head was obligated to send notice of the tender offers to the registered debenture owners.

██ In determining the reasonableness of the amount of the settlement in relation to the amount of a possible recovery after trial, the Court has considered the expert opinions submitted to the Court by Martin Whitman of M. J. Whitman & Co., and Robert Winston, of Winston Perry Financial Corporation, the evaluation by counsel, and the cost of litigating the aforementioned legal issues. The Court has also noted the favorable reaction of the classes to the settlement.[21] In light of these fac-

---

21. The plaintiff wrote in his affidavit in support of the proposed settlement, that:

Out of $14,295,000 convertible debentures, the owners of $1,240,000 communicated with us. The owners of $1,212,000 (including L. F. Rothschild & Co.) indicated acceptance, the owners of $27,000 opted out (not including $25,000 of the Rome objectants referred to hereafter). The owner of $1,000 said she would not sell a $1,000 bond for $844.16. [The acceptance of an additional $172,000 was noted at the hearing, 1st Tr. at 18.]

Out of 585,386 shares of publicly held common stock, the owners of 4,851 shares communicated with us, with the owners of 701 shares indicating acceptance, the owners of 3,271 shares opting out, and one owner of 1,050 shares objecting.

Out of 349,467 publicly held warrants, the owners of 9,070 communicated with us, all of whom indicated acceptance. [Plaintiff's affidavit at 9–10].

tors, we find the settlement fair and reasonable.[22]

■■■ The Romes raise a number of objections to the proposed settlement; most of them go to the scope of the settlement, and not the fairness of its terms. First they object to the designation of the suits as class actions for purposes of settlement only, on the grounds that this is unauthorized by Rule 23 and is violative of the provisions of the Manual for Complex Litigation, which advises against "a tentative determination of a class action request for the purpose of settlement."[23] The Second Circuit has stated in *Grinnell, supra,* that the Manual recommendations "were not meant to be intractable rules," and that the major concern of the Manual may be satisfied where, as here, the settlement provides "for notice of a hearing and an opportunity to challenge the fairness or any other aspect of the proposed settlement," *Grinnell,* 495 F.2d at 466. In addition, *Grinnell* stated that the Manual's objectives may be satisfied where, as here, the settlement was not negotiated in the early stages of the dispute, but rather after the parties had engaged in considerable litigation and were able to assess the risks of success, and where, as here, there were not different counsel vying to be class representatives before the settlement agreement was reached and publicized, thus not presenting a situation such as in *Ace Heating and Plumbing Co. v. Crane Co.,* 453 F.2d 30 (3d Cir. 1971). Therefore, the designation of these actions as class actions for purposes of settlement only was proper in this case.

■■■ The objectors also claim that there is an abuse of the use of Rule 23 as it is applied in this case to the convertible debenture holders. They note that the Rules Enabling Act[24] under which the Federal Rules of Civil Procedure were promulgated, specifically provided that the Rules should not abridge or modify any substantive rights. The abuse to which the objectors point is the proposed settlement, which they contend will abridge the substantive conversion rights of the debenture holders. We do not agree that the settlement abridges any substantive rights of the debenture holders (see p. 689 *infra*). Further, we find that the Rule 23 procedures were properly followed. Full notice was given to all members of the classes, and their rights to appear and object, or to opt out, were fully explained. Thus the Rule 23 procedures have protected the substantive rights of the individual debenture holders.

■■■ The Romes also challenge the adequacy of the notice of the proposed settlement. The notice complied with 23(c)(2) and clearly advised the class members of the nature of the pending action and the general terms of the settlement, and indicated where more detailed information was obtainable and where objections could be heard. All material facts were included.

■■■ Many of the Romes' objections arise out of an assertion that the Indenture prevents any class action settlement involving debenture owners, as the Court can in no way alter ". . . the creditors [debenture holders] . . . separate and several contract rights . . ."[25] without the individual written consent of each holder. They claim that the settlement can only bind those holders who affirmatively opt in and cannot bind those who do not respond. They also claim that the Indenture agreement prevents a forced conversion into money in the event of a merger, and requires either that Indian Head redeem the debentures[26] or that Indian Head respect the absolute right to convert into common stock.

---

**22.** Thus we find no merit in Mr. Shuldenrein's claim.

**23.** Manual for Complex Litigation § 1.40 (1975).

**24.** 28 U.S.C. 2074, repealed November 6, 1966, Pub.L. 89–773, § 2, 80 Stat. 1323.

**25.** Reply Brief of Objectors, p. 3.

**26.** At the current redemption price of $1,033 (103.30%).

An analysis of these arguments requires an interpretation of the Indenture agreement, particularly Sections 5.06, 12.02, 13.-01, and 13.02 (Articles 5, 12 and 13 of the Indenture are set out in Appendix A). Objectors argue that § 12.02, which provides for approval by two-thirds of the outstanding debentures when the issuer wishes to change or modify the Indenture itself, and requires consent of each debenture holder when the right to convert is altered or impaired, should be interpreted in this case to require the written consent of each debenture holder, since an attempt is being made to alter or impair the conversion right (2d Tr. at 6–10).

The plaintiffs and defendants argue in response that the voting requirements of § 12.02 do not apply in the case of a merger. Rather, they state that § 5.06, § 13.01 and § 13.02 (which do not call for individual consent or a two-thirds vote) should govern the merger,[27] since these sections specifically discuss what is to occur in case of a merger (Defendants' Memorandum in Response to Objectors' Brief at 20; 2d Tr. at 2–10). § 5.06 provides that:

> In case of any . . . merger into another corporation . . . such successor . . . shall execute and deliver to the Trustee a supplemental indenture . . . providing that the holder of each debenture than outstanding shall have the right thereafter to convert such debenture into the kind and amount of shares of stock and other securities and property receivable upon such . . . merger . . . by a holder of the number of shares of common stock of the company into which such debenture might have been converted immediately prior to such . . . merger . . .

First, we agree that § 5.06 should control here because it contains a detailed and specific provision as to what the debenture

holders' rights are in a merger while § 12.02 deals with their rights in a general context.

In the case of a merger, § 5.06 requires that the supplemental Indenture contain the right to convert into whatever form of property the shareholders receive in the merger. Thus the debenture holders have never had an absolute right to convert into Indian Head stock in a merger, but only the right to convert into whatever form of "property" the shareholders would receive. Defendants argue that cash is "property" within the meaning of § 5.06. We agree that cash is within the scope of the term "property" as used in § 5.06, and note that it has been so interpreted in *Broenen v. Beaunit,* 440 F.2d 1244 (7th Cir. 1970). Here, as a result of the proposed merger, the Indian Head shareholders will receive only cash for their stock. Thus the provision in the settlement agreement allowing for conversion of the debentures into cash only is proper under § 5.06 because this is all the shareholders are receiving. In addition, § 5.06 does not require the individual written consent of each debenture holder when conversion rights are altered pursuant to a merger, so we conclude that the settlement abridges no rights of the debenture holders and can properly bind all debenture holders who do not opt out.

▮▮▮ Since we find that no substantive rights of the debenture holders are abridged by this settlement, this dispenses with the following objectors' claims: 1) that representation of the class was not adequate since class representatives cannot assert rights running individually and severally to each holder (Objectors' Brief in Support of Objections to Proposed Settlement at 15–16, 23–25); 2) that their constitutional rights under the Fifth and Fourteenth Amendments and Article One, Section 10 were violated (*Id.* at 16–17); 3) that the class is not sufficiently numerous, since not a sufficient number assented in writing (*Id.* at 23); and 4) that the settlement vio-

---

27. The debenture holders were alerted to the applicability of these sections by the debenture itself, which stated that ". . . the holder . . . has the right . . . to convert this debenture into fully paid and non-assessable charges of Common Stock of the Company . . . . subject to such adjustment, if any, of the conversion rate and the securities or other property issuable upon conversion as may be required by the provisions of the Indenture."

lates rights of all non-assenting convertible debenture owners under Delaware law (*Id.* at 40), New York law (*Id.* at 41), and Pennsylvania law (*Id.* at 43).

The Rome objectors also claim that the settlement agreement violates various sections of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ["1933 Act"], the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ["1934 Act"], and the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa *et seq.*

▮▮▮ Objectors claim that § 5(c) of the 1933 Act[28] has been violated since the proposed settlement and notice of settlement is an "offer to sell" as well as an "offer to buy" securities, and as such the parties have not complied with the registration requirements of the Act. The settlement agreement is clearly not an offer by TBE to sell a security. While the settlement may be interpreted to encompass an "offer to buy," we find that the registration requirements of § 5(c) were not meant to apply to offers of an issuer or controlling stockholder of an issuer, to acquire for cash the issuer's outstanding securities.

> When the issuer itself is making an offer to buy its own securities—at least when the offer goes to a substantial number of security holders—§ 5(c) would seem literally to apply in the sense that there is no specific exemption or exclusion; for that *is* an offer (and hence a transaction) "by an issuer." On the other hand, however tempting it might have been before the special legislation of 1968 to reenforce Rule 10b–5 under the 1934 Act by using § 5(c) to attack the problems of inadequate disclosure by issuers in public tender offers . . . not merely the legislative history of § 5(c) but the whole registration structure of the 1933 Act is utterly inconsistent with any concept of issuers registering public offerings to buy as distinct from public offerings to sell.

**28.** 15 U.S.C. § 77e.

**29.** 15 U.S.C. § 77c(a)(10).

**30.** 3(a)(10) has been applied to judicially approved settlements, see *LIN Broadcasting*

> 4 Loss, *Securities Regulation* 2317–8 (Supplement to 2d Ed., 1969).

Rather, Loss found that the provision "was originally inserted solely for the purpose of preventing *dealers* from making offers to buy from underwriters during the waiting period." 1 Loss, *Securities Regulation* 212 (2d Ed., 1961).

▮▮▮ Even if the requirements of § 5(c) were held to apply to offers by an issuer to buy its own stock, plaintiffs and defendants claim that § 3(a)(10)[29] would exempt the settlement from the registration requirements.[30] Section 3(a)(10) states:

> Sec. 3(a) Except as hereinafter expressly provided the provisions of this title shall not apply to the following classes of securities:
>
> \*    \*    \*    \*    \*    \*
>
> (10) Any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval.
>
> .    .    .

According to the objectors, a Supplemental Indenture with modified conversion rights will be issued as a consequence of the settlement to debenture holders who do not convert, is a "security" within the meaning of § 5(c). (Objectors' Brief at 31). They contend, therefore, that the provisions of § 5(c) are applicable. If so, it would seem to follow that § 3(a)(10) would also apply to

*Corp.* [1972–73 Transfer Binder] CCH Fed.Sec. L.Rep. ¶ 79,154 at 82,512; *VTR Inc.* [1971–72 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 78,518 at 81,117.

exempt the transaction, since there would be an issuance of a security (Supplemental Indenture) in exchange for "bona fide outstanding securities" (the Indenture).[31] The objectors argue further, nevertheless, that there is no exemption because the required judicial hearing was held after the issuance of the security, not before (2d Tr. at 32–34).

This view is predicated on the assumption that the notice of settlement was an issuance of a security. The Court does not hold that view because the terms of the settlement do not become effective until approved by the Court. The hearing on the fairness of the terms and conditions of the settlement at which all persons affected had an opportunity to appear and be heard, was held on October 13 and 18, 1976. Thus the hearing fully complied with the requirements of § 3(a)(10).

▮▮▮ The objectors also claim the class notice omitted certain material facts[32] in violation of § 17(a) of the 1933 Act, and sections 10(b) and 14(e) of the 1934 Act. We find the notice in this case more than adequate, and that these sections have not been violated. Since we also have concluded that no terms or rights under the Indenture are violated by the settlement, [see pp. 688–689 *supra*], no action will lie under the Trust Indenture Act.

▮▮▮ In addition, the objectors claim that the notice of settlement violates sections 13(d), 13(e), 14(d), and 14(e) of the 1934 Act[33] and the Rules promulgated under these sections. They claim that the notice constitutes a "tender offer," and as such the defendants have failed to comply with the filing requirements of the Act. While the settlement agreement does contemplate what might technically be described as a tender offer,[34] we think that these sections were not meant to apply to judicially approved settlement agreements, particularly in light of the legislative history.

Congress' principal concern was to assure the shareholder substantial timely disclosure . . . Congress determined that the shareholder should have the 'relevant facts' so he can make an informed decision on whether to sell his holdings or to maintain his investment in a company that might be changing hands and undergoing significant transformation. Note, 86 *Harv.L.Rev.* 1250, 1256 (1973).

As noted by the Seventh Circuit:

. . . the overriding purpose of Congress in enacting this legislation was *to protect the individual investor* when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed. In the words of Senator Williams: '[The bill] is designed solely to require

**31.** Because the issuance of the Supplemental Indenture is not a specific term of the settlement, but is activated by the terms of the prior Indenture (which require such a Supplemental Indenture in the case of a merger), it could be argued that the settlement itself is purely a cash exchange, whereby TBE is issuing cash only for Indian Head securities. While under this view § 3(a)(10) would seem not to be directly on point (since no security is being issued), it might be held to be applicable in light of the purpose of the registration sections. The purpose of requiring registration is to place the facts before the public, and to protect against fraud and misrepresentation, 1 Loss, *Securities Regulation* 178–181 (2d Ed., 1961). Section 3(a)(10) provides an exception to this requirement where the facts have been disclosed and the fairness of the terms and conditions have been passed on by a Court. While this section only applies when securities are issued, the same policy considerations would

seem to apply to transactions where cash only is being offered in exchange for an outstanding security. Thus an exemption from § 5(c) should be allowed for offers to buy outstanding securities with cash which have been judicially approved after a hearing.

**32.** Objectors' Brief at 25 and 32.

**33.** 15 U.S.C. § 78m *et seq.* and § 78n *et seq.*, passed in 1968 and commonly known as the "Williams Act."

**34.** The term "tender offer" is not defined in the statute, regulations, or legislative history. Thus Courts have found that they have latitude to apply the provisions of § 14 in light of the factual context. *Nachman Corporation v. Halfred, Inc.,* [1973–74 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,445 at 95,589, 590 (N.D.Ill. 1973).

full and fair disclosure for the benefit of investors' . . . *Bath Industries, Inc. v. Blot,* 427 F.2d 97, 109 (7th Cir. 1970). See also *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 945 (2d Cir. 1969); 113 Cong.Rec. 24664 (1967). That the purpose was to protect the individual investor can also be seen from looking at what the Act requires to be disclosed. It requires disclosure of, among other things, the identity and background of the person or group making the tender offer; the size of the holdings of the person or group; the source of funds to be used and the financing arrangements for these funds; the purpose of the tender offer, and the plans of the offeror (to liquidate, sell, merge, etc.); and the price, terms, and conditions of the offer.

██ We find that the individual investors have been more than adequately protected by the procedures followed in the instant judicially-approved settlement, where the individual investor has had full notification of the terms of the offer, the people or groups involved, the purpose of the offer and the plans of the offeror. Thus we conclude that the filing requirement of the Williams Act does not preclude this settlement.[35]

Accordingly, the Court concludes that the settlement is fair and reasonable, and should be approved.

SO ORDERED.

## APPENDIX A

## ARTICLE FIVE

## CONVERSION OF DEBENTURES

SECTION 5.01. The holder of any Debenture or Debentures shall have the right at any time prior to maturity, at his option, to convert, subject to the terms and provisions of this Article Five, the principal amount of any such Debenture or Debentures (or any portion of the principal amount thereof which is an integral multiple of $1000) into fully paid and non-assessable shares of Common Stock at the conversion rate of 25.974 shares of Common Stock for each $1,000 principal amount of Debentures, subject in each case to any adjustments in such conversion rate pursuant to the provisions of Section 5.04 (except that with respect to any Debenture or Debentures which shall be called for redemption such right shall terminate at the close of business on the second business day next preceding the date fixed for redemption of such Debenture or Debentures, unless the Company shall default in payment due upon redemption thereof), upon surrender of the Debenture or Debentures, the principal of which is so to be converted, to the Company at any time during usual business hours at the office or agency to be maintained by it in accordance with the provisions of Section 6.02, and, if so required by the Company, accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and the Trustee duly executed by the holder or his duly authorized agent or legal representative. Prior to delivery of any certificate or certificates representing shares of Common Stock into which the principal of such Debenture or Debentures is so to be converted, the Company shall have received a written notice at its said office or agency from the holder of the Debenture or Debentures so surrendered specifying the name or names (with address) in which said certificate or certificates are to be issued. For convenience, the conversion of all or a portion, as the case may be, of the principal of any Debenture into Common Stock is hereinafter sometimes referred to as the conversion of such Debenture. All Debentures surrendered for conversion shall if surrendered to the Company or any conversion agent, be delivered to the Trustee for cancelation and cancelled by it or, if surrendered to the Trustee, shall be cancelled by it, and no Debentures shall be issued in lieu thereof. The Trustee within a reasonable time shall

---

**35.** In addition, 14(d)(8)(B) provides that there is an exemption from the filing requirements of 14(d) for "any offer for or request or invitation for tenders of any security . . . by the issuer of such security."

upon request return cancelled Debentures to the Company.

In case any Debenture shall be surrendered for conversion of only a portion of the principal amount thereof, the Company shall execute and the Trustee shall authenticate and deliver to the holder of such Debenture, at the expense of the Company, a new Debenture or Debentures in principal amount equal to the unconverted portion of the Debenture so surrendered.

In case of the surrender of any Debenture for conversion (in whole or in part) on a date after the record date (as defined in Section 2.03) for the payment of any interest on Debentures and before the date for payment of such interest, such Debenture shall be accompanied by funds in an amount equal to the amount of interest which would have been payable on such interest payment date in respect of the principal represented by the Debenture (or portion thereof) so surrendered for conversion had the same not been so surrendered for conversion; *provided, however,* that no such funds need be deposited in the case of any Debenture (or portion thereof) which has been duly called for redemption prior to such interest payment date. The funds so deposited shall be paid on the interest payment date to the person in whose name such Debenture (or the Debenture or Debentures in exchange or substitution for which such Debenture shall have been issued) was registered on such record date; *provided, however,* that if the Company shall default in the payment of interest due on the Debentures on such interest payment date, such funds shall be repaid to the person who deposited the same.

SECTION 5.02. As promptly as practicable after the surrender, as herein provided, of any Debenture or Debentures for conversion, the Company shall deliver or cause to be delivered at the office or agency to be maintained by it in accordance with the provisions of Section 6.02 to or upon the written order of the holder of the Debenture or Debentures so surrendered a certificate or certificates representing the number of fully paid and non-assessable shares of Common Stock into which such Debenture or Debentures (or portion thereof) shall have been converted in accordance with the provisions of this Article Five. Prior to delivery of such certificate or certificates, the Company shall have received at its said office or agency from the holder of the Debenture or Debentures so surrendered the written notice referred to in Section 5.01 with respect to the name or names (with address) in which said certificate or certificates are to be issued. Subject to the following provisions of this Section and of Section 5.04, such conversion shall be deemed to have been made immediately prior to the close of business on the date that such Debenture or Debentures shall have been surrendered for conversion, so that the rights of the holder of such Debenture or Debentures (or the portion thereof being converted) as a Debentureholder shall cease at such time, and the person or persons entitled to receive the shares of Common Stock upon conversion of such Debenture or Debentures shall be treated for all purposes as having become the record holder or holders of such shares of Common Stock at such time, and such conversion shall be at the conversion rate in effect at such time; *provided, however,* that no such surrender on any date when the stock transfer books of the Company shall be closed shall be effective to constitute the person or persons entitled to receive the shares of Common Stock upon such conversion as the record holder or holders of such shares of Common Stock on such date, but such surrender shall be effective to constitute the person or persons entitled to receive such shares of Common Stock as the record holder or holders thereof for all purposes at the time immediately prior to the close of business on the next succeeding day on which such stock transfer books are open, and such conversion shall be at the conversion rate in effect at such time on such next succeeding day.

SECTION 5.03. No adjustments in respect of accrued interest or dividends shall be made upon the conversion of any Debenture or Debentures.

SECTION 5.04. The conversion rate from time to time in effect shall be subject to adjustment as follows:

(a) In case the Company shall (i) pay a dividend in shares of its capital stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of Common Stock into a smaller number of shares, or (iv) issue by reclassification of its shares of Common Stock any shares of the Company, the conversion rate in effect immediately prior thereto shall be adjusted retroactively as provided below so that the holder of any Debenture thereafter surrendered for conversion shall be entitled to receive the number of shares of the Company which he would have owned or have been entitled to receive after the happening of any of the events described above had such Debenture been converted immediately prior to the happening of such event. An adjustment made pursuant to this subsection (a) shall become effective retroactively immediately after the record date in the case of a dividend and shall become effective immediately after the effective date in the case of a subdivision, combination or reclassification.

(b) In case the Company shall issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within 45 days after the record date mentioned below) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share of Common Stock (as defined in subsection (d) below) at the record date mentioned below, the number of shares of Common Stock into which each $1,000 principal amount of Debentures shall thereafter be convertible shall be determined by multiplying the number of shares of Common Stock into which such principal amount of Debentures was theretofore convertible by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding on the date of issuance of such rights or warrants plus the number of additional shares of Common Stock offered for subscription or purchase, and the denominator of which shall be the number of shares of Common Stock outstanding on the date of issuance of such rights or warrants plus the number of shares which the aggregate offering price of the total number of shares so offered would purchase at such current market price. Subject to subsection (e), such adjustment shall be made whenever such rights or warrants are issued and shall become effective retroactively immediately after the record date for the determination of stockholders entitled to receive such rights or warrants.

(c) In case the Company shall distribute to all holders of its Common Stock evidences of its indebtedness or assets (excluding cash dividends or distributions) or rights to subscribe or warrants to purchase (excluding those referred to in subsection (b) above), then in each such case the number of shares of Common Stock into which each $1,000 principal amount of Debentures shall thereafter be convertible shall be determined by multiplying the number of shares of Common Stock into which such principal amount of Debentures was theretofore convertible by a fraction, the numerator of which shall be the current market price (as defined in subsection (d) below) per share of Common Stock on the date of such distribution, and the denominator of which shall be such current market price per share of the Common Stock, less the then fair market value (as determined by the Board of Directors, whose determination shall be conclusive, and described in a statement filed with the Trustee) of the portion of the assets or evidences of indebtedness so distributed or of such subscription rights or warrants applicable to one share of the Common Stock. Subject to subsection (e), such adjustment shall be made whenever any such distribution is made and shall become effective retroactively immediately after the record date for the determination of stockholders entitled to receive such distribution.

(d) For the purpose of any computation under subsections (b) and (c) above, the

current market price per share of Common Stock at any date shall be deemed to be the average of the daily closing prices for the 30 consecutive business days commencing 45 business days before the day in question. The closing price for each day shall be the last reported sales price regular way or, in case no such reported sale takes place on such day, the average of the reported closing bid and asked prices regular way, in either case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading, or if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange firm selected from time to time by the Company for the purpose.

(e) No adjustment in the conversion rate shall be required unless such adjustment would require an increase or decrease of at least 1% in such rate; *provided, however*, that any adjustments which by reason of this subsection (e) are not required to be made shall be carried forward cumulatively and taken into account in any subsequent adjustment which (including such carry-forward) requires an increase or decrease of at least 1%. All calculations under this Article Five shall be made to the nearest cent or to the nearest one-thousandth of a share, as the case may be.

(f) Whenever the conversion rate is adjusted, as herein provided, the Company shall promptly file with the Trustee a certificate of a firm of independent public accountants selected by the Board of Directors (who may be the regular accountants employed by the Company) setting forth the conversion rate applicable after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Such certificate shall be conclusive evidence of the correctness of such adjustment. Promptly after receipt of such certificate, the Trustee, in the name of the Company and as its agent, shall mail a notice specifying such adjustment to each Debentureholder at his last address appearing on the registration books of the Company. The Trustee shall not at any time be under any duty or responsibility to any Debentureholder to determine whether any facts exist which may require any adjustment of the conversion rate.

(g) In the event that at any time, as a result of an adjustment made pursuant to subsection (a) of this Section, the holder of any Debenture thereafter surrendered for conversion shall become entitled to receive any shares of the Company other than shares of its Common Stock, thereafter the number of such other shares so receivable upon conversion of any Debenture shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Common Stock contained in subsections (a) to (f), inclusive, of this Section, and the provisions of Sections 5.02 and 5.05 to 5.09, inclusive, with respect to the Common Stock shall apply on like terms to any such other shares.

SECTION 5.05. No fractional shares or scrip representing fractional shares shall be issued upon the conversion of any Debenture or Debentures. If more than one Debenture shall be surrendered for conversion at one time by the same holder, the number of full shares issuable upon conversion thereof shall be computed on the basis of the aggregate principal amount of the Debentures so surrendered. If the conversion of any Debenture or Debentures results in a fraction, an amount equal to such fraction multiplied by the closing price (determined as provided in Section 5.04(d)) of the Common Stock on the day of conversion shall be paid to such holder in cash by the Company.

SECTION 5.06. In case of any consolidation of the Company with or merger of the Company into another corporation, or in case of any sale or other disposition of all or substantially all the property of the Company as an entirety to any person, the corpo-

ration resulting from such consolidation or such successor or acquiring person, as the case may be, shall execute and deliver to the Trustee a supplemental indenture, in form satisfactory to the Trustee, providing that the holder of each Debenture then outstanding shall have the right thereafter to convert such Debenture into the kind and amount of shares of stock and other securities and property receivable upon such consolidation, merger, sale, lease or other disposition by a holder of the number of shares of Common Stock of the Company into which such Debenture might have been converted immediately prior to such consolidation, merger, sale or other disposition. Such supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article Five. The provisions of this Section shall similarly apply to successive consolidations, mergers, sales or other dispositions. Notice of the execution of such a supplemental indenture shall be given in accordance with the provisions of Section 12.02.

The Trustee shall not be under any responsibility to determine the correctness of any provisions contained in any such supplemental indenture relating either to the kind or amount of shares of stock or securities or property receivable by Debentureholders upon the conversion of their Debentures after any such consolidation, merger, sale, lease or other disposition or to any such adjustment, but, subject to the provisions of Section 9.01, may accept as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, an Opinion of Counsel with respect thereto.

SECTION 5.07. The Company covenants that it will at all times reserve and keep available out of its authorized Common Stock, solely for the purpose of issuance upon conversion of Debentures as herein provided, such number of shares of Common Stock as shall then be issuable upon the conversion of all outstanding Debentures. The Company covenants that all shares of Common Stock which shall be so issuable shall, when issued, be duly and validly issued and fully paid and non-assessable.

The Company covenants that, upon conversion of Debentures as herein provided, there will be credited to Common Stock capital account, from the consideration for which the shares of Common Stock issuable upon such conversion are issued, an amount per share of Common Stock so issued as determined by the Board of Directors, which amount shall not be less than the amount required by law and by the Certificate of Incorporation of the Company, as amended, as in effect on the date of such conversion. For the purposes of this covenant the principal amount of the Debentures converted, less the amount of cash paid in lieu of the issuance of fractional shares on such conversion, shall be deemed to be the amount of consideration for which the shares of Common Stock issuable upon such conversion are issued.

SECTION 5.08. The Company covenants that if any shares of Common Stock required to be reserved for purposes of conversion of Debentures hereunder require registration with or approval of any governmental authority under any Federal or State law before such shares may be issued upon conversion, the Company will in good faith and as expeditiously as possible endeavor to cause such shares to be duly registered or approved, as the case may be. The Company further covenants that, at any time when the Common Stock of the Company is listed on the New York Stock Exchange or any other national securities exchange, the Company will, if permitted by the rules of such exchange, list and keep listed on such exchange, upon official notice of issuance, all shares of Common Stock issuable upon conversion of Debentures.

SECTION 5.09. The issuance of certificates for shares of Common Stock upon the conversion of Debentures shall be made without charge to the converting Debentureholders for any tax in respect of the issuance of such certificates, and such certificates shall be issued in the respective names of, or in such names as may be

directed by, the holders of the Debentures converted; *provided, however,* that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any such certificate in a name other than that of the holder of the Debenture converted, and the Company shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

SECTION 5.10. In case the Company proposes to take any action (other than actions of the character described in clauses (i), (ii) or (iii) of subsection (a) of Section 5.04) which would require an adjustment of the conversion rate pursuant to Section 5.04 or proposes to take any action of the type specified in Section 5.06, the Company shall give notice to the holders of Debentures at their last addresses as they shall appear upon the register or registers provided for in Section 2.05 at least ten days prior to the applicable record date in the case of action which would require an adjustment of the conversion rate pursuant to Section 5.04 and at least ten days prior to the taking of any action described in Section 5.06, which notice shall state (i) in the case of action requiring an adjustment of the conversion rate pursuant to Section 5.04, the record date as of which such action is to be taken and (ii) in the case of action specified in Section 5.06, the date on which such action is to become effective, and in each case such notice shall describe the action to be taken and, to the extent such effect may be known at the date of such notice, the effect of such action on the conversion ratio and the number, or kind, or class of shares or other securities or property obtainable upon conversion of the Debentures. Failure to give such notice or any defect therein shall not affect the legality or validity of any such action.

SECTION 5.11. The Trustee shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the conversion of any Debentures; and it makes no representation with respect thereto. The Trustee shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property upon the surrender of any Debenture for the purpose of conversion, or to comply with any of the covenants of the Company contained in this Article Five, all subject to Section 9.01.

## ARTICLE TWELVE

### SUPPLEMENTAL INDENTURES

SECTION 12.01. In addition to any supplemental indenture that may be entered into pursuant to the provisions of Section 5.06, the Company, when authorized by a resolution of its Board of Directors, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act of 1939 as then in effect) for one or more of the following purposes:

(a) to evidence the succession of another corporation to the Company, or successive successions, and the assumption by the successor corporation of the covenants, agreements and obligations of the Company pursuant to Article Thirteen;

(b) to add to the covenants and agreements of the Company in this Indenture contained such further covenants and agreements thereafter to be observed and to surrender any right or power herein reserved to or conferred upon the Company;

(c) to cure any ambiguity or to correct or supplement any defective or inconsistent provision contained in this Indenture or in any supplemental indenture; and

(d) to make such provisions in respect to matters or questions arising under this Indenture as may be necessary or desirable and not inconsistent with this Indenture; *provided, however,* that such ac-

tions shall not adversely affect the interests of the holders of any of the Debentures.

The Trustee is hereby authorized to join with the Company in the execution of any supplemental indenture authorized or permitted by the terms of this Indenture, and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Any supplemental indenture authorized by the provisions of this Section may be executed by the Company and the Trustee without the consent of the holders of any of the Debentures at the time outstanding.

SECTION 12.02. With the consent (evidenced as provided in Section 10.01) of the holders (or persons entitled to vote or to give consents respecting the same) of not less than 66⅔% in aggregate principal amount of the Debentures at the time outstanding, the Company, when authorized by a resolution of its Board of Directors, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act of 1939 as then in effect) for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights and obligations of the holders of the Debentures and of the Company; *provided, however,* that no such supplemental indenture shall (i) extend the fixed maturity of any Debentures, or reduce the principal amount thereof, or reduce the rate or extend the time of payment of interest thereon, or reduce any premium payable upon the redemption thereof, or alter or impair the right to convert the same into shares of Common Stock at the rates and upon the terms provided herein, without the consent of the holder of each Debenture so affected, or (ii) reduce the aforesaid percentage of Debentures, the

holders of which are required to consent to any such supplemental indenture, without the consent of the holders of all Debentures then outstanding.

Upon the request of the Company, accompanied by a copy of a resolution of its Board of Directors certified by the Secretary or an Assistant Secretary of the Company authorizing the execution of any such supplemental indenture, and upon the filing with the Trustee of evidence of the consent of Debentureholders as aforesaid, the Trustee shall join with the Company in the execution of such supplemental indenture unless such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may, in its discretion, but shall not be obligated to, enter into such supplemental indenture.

It shall not be necessary for the consent of the Debentureholders under this Section to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution by the Company and the Trustee of any supplemental indenture pursuant to the provisions of this Section, the Company shall mail, first class postage prepaid, to the holders of Debentures at their last addresses as they shall appear upon the register or registers a notice setting forth in general terms the substance of such supplemental indenture. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

SECTION 12.03. Upon the execution of any supplemental indenture pursuant to the provisions of this Article Twelve or of Sections 5.06 and 13.01 this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the holders of Debentures shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications

and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

SECTION 12.04. Debentures authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article Twelve or of Sections 5.06 and 13.01, or after any action taken at a Debentureholders' meeting pursuant to Article Eleven, may bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture or as to any action taken at any such meeting; and, in such case, suitable notation may be made upon outstanding Debentures after proper presentation and demand. If the Company or the Trustee shall so determine, new Debentures so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any modification of this Indenture contained in any such supplemental indenture, or to any action taken at any such meeting, may be prepared by the Company, authenticated by the Trustee and delivered in exchange for the Debentures then outstanding, upon demand of, and without cost to, the holders thereof, upon surrender of such Debentures.

SECTION 12.05. The Trustee, subject to the provisions of Section 9.01, may receive an Opinion of Counsel as conclusive evidence that any supplemental indenture executed pursuant to this Article Twelve is authorized or permitted by the terms of this Indenture and that it is not inconsistent therewith.

## ARTICLE THIRTEEN

## CONSOLIDATION, MERGER AND SALE

SECTION 13.01. The Company will not consolidate with, merge into or sell or otherwise dispose of all or substantially all the property of the Company as an entirety to, any person unless (a) the successor formed by or resulting from such consolidation or merger or the person to which such sale or other disposition shall have been made shall be a corporation organized under the laws of the United States of America or any State, district or territory thereof, and (b) such successor corporation (other than the Company) shall expressly assume, by indenture supplemental hereto satisfactory in form to the Trustee, executed and delivered to the Trustee by the corporation formed by such consolidation or into which the Company shall have been merged or by the corporation to which such sale or other disposition shall have been made, the due and punctual payment of the principal of and interest (and premium, if any) on the Debentures according to their tenor, and the due and punctual performance and observance of all the terms, covenants and conditions of this Indenture and the Debentures to be performed or observed by the Company. The Company will not so consolidate or merge, or make any such sale or other disposition, or permit any corporation to merge into the Company, unless immediately after such consolidation, merger, sale or other disposition the Company or such successor corporation, as the case may be, shall not be in default in the performance of any of the covenants, agreements or conditions contained in this Indenture or in the Debentures. Subject to the foregoing provisions of this Section, nothing contained in this Indenture or in any of the Debentures shall prevent any consolidation or merger of the Company with or into any other corporation or corporations (whether or not affiliated with the Company), or successive consolidations or mergers to which the Company or its successor or successors shall be a party or parties, or shall prevent any sale or other disposition (or successive sales or disposition) of all or substantially all the property and assets of the Company (or its successor or successors) as an entirety, to any other corporation (whether or not affiliated with the Company) lawfully entitled to acquire and operate the same. In the event of any such sale or disposition, the predecessor company may be dissolved, wound up and liquidated at any time thereafter.

SECTION 13.02. In case of any such consolidation, merger, sale or other disposition and upon the execution by the succes-

sor corporation of an indenture supplemental hereto, as provided in Section 13.01, and upon compliance by such successor corporation with all applicable provisions of Section 5.06, such successor corporation shall succeed to and be substituted for the Company, with the same effect as if it had been named herein as a party; and any order, certificate, statement, request, instructions, advice or resolutions of the Board of Directors or officers of the Company provided for in this Indenture may be made by like officials of such successor corporation.

Nothing contained in this Indenture or in any of the Debentures shall prevent the Company from acquiring by purchase or by merger or consolidation in which the Company is the surviving corporation, or otherwise, all or any part of the property of any other corporation (whether or not affiliated with the Company).

SECTION 13.03. The Trustee, subject to the provisions of Section 9.01, may receive an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale or other disposition, and any such assumption and supplemental indenture, complies with the provisions of this Article Thirteen.