G. A. THOMPSON & CO., INC., Plaintiff-Appellee,

v.

Herbert PARTRIDGE, Robert M. Presley, Frank Andrews and C. Thomas Murphy, Defendants-Appellants.

No. 78–3492.

United States Court of Appeals, Fifth Circuit.

Feb. 9, 1981.

Robert A. Elsner, Michael Weinstock, Kevin S. King, Janet L. Haynes, Robert W. Scholz, Atlanta, Ga., for Presley.

Paul W. Stivers, Richard H. Sinkfield, Atlanta, Ga., for plaintiff-appellee.

Before KRAVITCH, HENDERSON and REAVLEY, Circuit Judges.

KRAVITCH, Circuit Judge.

In this securities fraud case, a jury found in favor of plaintiff-appellee, G. A. Thompson Co. [Thompson Co.], against appellants, the shareholders, directors, and officers of Lincoln Home Mortgage Co. [Lincoln], for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5.[1] The district judge directed a verdict against appellants based upon a separate count claiming misappropriation of corporate assets in violation of *Ga.Code Ann.* §§ 22–714 and 22–715.[2] We affirm the judgment in

1. Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> .     .     .     .     .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b–5 provides:

> Employment of manipulative and deceptive devices.
>
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

2. Sections 22–714, 22–715 and 22–511(a) provide in relevant part:

> **22–714 Action against directors and officers**
>
> (a) An action may be brought by any persons named in subsection (b) of this section against one or more directors or officers of a corporation to procure for the benefit of the corporation a judgment for the following relief:

> (1) to compel the defendant to account for his official conduct, or to decree any other relief called for by his official conduct, in the following cases:
>
> (A) The neglect of, or failure to perform, or other violation of his duties in the management of the corporation, or in the disposition of corporate assets committed to his charge.
>
> (B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.
>
> (C) The appropriation, in violation of his duties, of any business opportunity of the corporation.
>
> (2) To enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets or other unlawful corporate transaction, where there is sufficient evidence that it will be made.
>
> (3) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness and is made a party to the action.
>
> (b) An action may be brought for the relief provided in this section, and in the provisions of section 22–715 relating to the liability of directors in certain cases, by the corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof, or by a shareholder in accordance with sections 22–614 and 22–615 relating to derivative actions.
>
> .     .     .     .     .
>
> (d) This section shall not limit any liability otherwise imposed by law upon any director or officer or any third party.
>
> **22–715 Liability of directors in certain cases**
>
> (a) In addition to any other liabilities imposed by law upon directors of a corporation:
>
> (1) Directors of a corporation who vote for or assent to the declaration of any dividend or other distribution of the assets of a corporation to its shareholders contrary to the provisions of this Code [Chapters 22–1 through 22–20] or contrary to any restrictions contained in the articles of incorporation, shall

the amount of $123,825.89[3] on the 10b–5 count. We reverse the judgment on the misappropriation count because appellee failed to show that the corporation could not satisfy the debt owed appellee, a showing required before a judgment creditor can sue a director for misappropriation of assets.[4]

## I. *Facts*

In July of 1975, appellants Presley, Partridge, Andrews, and a fourth person, not a party here, bought 96% of the stock of Lincoln, 24% each. The four became officers and directors of Lincoln which marketed mortgage loans. To market such loans, Lincoln needed FHA approval, which in turn was conditioned upon Lincoln having net assets of at least $100,000. To maintain FHA approval, Lincoln purchased a $100,000 bank certificate of deposit,[5] although with borrowed funds.[6] Thus, Lincoln's net assets did not increase, but because it did

not list the $100,000 liability on its balance sheet, Lincoln maintained FHA approval.

In September of 1975, Hitchcock of Thompson Co. began discussing with Partridge the possibility of their companies doing business together. Thompson Co. is a broker dealer trading *inter alia* in Government National Mortgage Association securities (GNMA's). GNMA's are government issued securities representing a pool of mortgage loans; GNMA's can be acquired by a company having a designated amount of loans and fulfilling a routine application process. Partridge and Hitchcock discussed the possibility of Thompson Co. buying GNMA's from Lincoln. In the discussion, Partridge represented to Hitchcock that Lincoln had significantly more loans, both in progress and closed, than Lincoln actually had.[7] Hitchcock relied on Partridge's representations without corroboration because Hitchcock previously worked with Partridge for another employer, at which

be jointly and severally liable to the corporation for the amount of such dividend which is paid or the value of such assets which are distributed in excess of the amount of such dividend or distribution which could have been paid or distributed without a violation of the provisions of this Code or the restrictions in the articles of incorporation to the extent that any creditor or shareholder of the corporation has suffered damage as a result thereof.

**22–511  Dividends**

(a) The board of directors of a corporation may, from time to time, declare and the corporation thereupon shall pay dividends on its outstanding shares in cash, property, or its own shares, except when the corporation is insolvent or when the payment thereof would render the corporation insolvent or when the declaration or payment thereof would be contrary to any restrictions contained in the articles of incorporation, and subject to the following provisions . . .

§§ 22–714, 22–715, 22–511.

.    .    .    .    .

Neither the parties nor the record makes it clear whether Thompson Co. is suing as a judgment creditor or as a Lincoln shareholder, nor whether Thompson Co. is suing directly or derivatively, either of which a shareholder and judgment creditor can do. *See Davis v. Ben O'Callaghan Co.*, 218 Ga. 238, 232 S.E.2d 53 (1977). However, the absence of any mention in the briefs of the requirements for a derivative action indicate the suit is direct. Furthermore, the amount sued for and the nature of

the cause of action indicate Thompson Co. sued as a judgment creditor.

Appellants make no argument that they did not vote for or assent to the distributions.

**3.**  The jury returned a verdict of $30,936 against each appellant individually. As discussed *infra*, the judge entered judgment for $126,325.89 making each appellant jointly and severally liable. We hold that the judge erred in raising the amount over $123,825.89.

**4.**  A breach of contract count against Lincoln, originally a defendant in this action, and against appellants (for reasons which are not clear) is not before us because Lincoln entered into a consent judgment for the full $126,325.89 being sued for and the count against appellants was not pressed at trial. A common law fraud count was dismissed at trial. The judge dismissed it as to Andrews and Presley; appellee withdrew it as to Partridge.

**5.**  Apparently appellants did not purchase the assets which gave rise to the previous FHA approval.

**6.**  The corporation borrowed the $100,000 from the same bank from which it purchased the CD and in which it deposited the CD. The appellants signed as guarantors.

**7.**  It is disputed whether Partridge represented Lincoln had 2.3 or 4 to 5 million dollars of loans in progress.

job Partridge had an excellent reputation for integrity and for expertise in procuring mortgage loans. In late September, Partridge entered into a contract on behalf of Lincoln to sell one million dollars in GNMA securities to Thompson Co. to be delivered on December 15, 1975. On October 1, Partridge contracted to sell an additional one and one-half million dollars in GNMA securities to Thompson Co. to be delivered on January 15, 1976.

During October, the market turned sharply against Lincoln, which meant that Lincoln would not be able to obtain enough loans to cover its commitment to Thompson Co., loans it had represented in September that it already had. As a result, Lincoln entered into cover transactions by which it agreed to buy from Thompson Co. the exact amount of GNMA securities it had agreed to sell and on the same dates.[8] Only the prices differed, so that the contracts cancelled each other out and Lincoln owed Thompson Co. $123,825.89. The purpose of these covering contracts was to limit Lincoln's liability, for if the market continued in the same direction, Lincoln's liability on the delivery dates would have been much higher than the $123,825.89.

In November, Lincoln, through Partridge, authorized Thompson Co. to act as agent for Lincoln in disposing of the loans Lincoln did own. Lincoln agreed that all proceeds of the sale would go to Thompson Co. to offset the $123,825.89 debt and, in addition, to pay Thompson Co. a commission of $2,500. The proceeds of the December 15, 1975 sale, $27,305.30, however, were not given to Thompson Co.; instead they were used to pay off other creditors or as distributions to appellants. Nor was the commission paid.

In December 1975, Thompson Co. sued appellants and Lincoln alleging 10b–5 viola-

tions based on the misrepresentation of the loans Lincoln had and, since it was FHA-approved, based on the implicit misrepresentation that it owned $100,000 in assets. In the same action, Thompson Co. claimed misappropriation of corporate assets and breach of contract, the former against only the appellants, the latter against appellants and Lincoln. The total amount eventually prayed for was $126,325.89 (the same $123,825.89 under the misappropriations, contract, and fraud counts, and the same additional $2,500 under the misappropriations and contract counts). During pendency of the suit, a majority interest in Lincoln was sold several times until eventually Thompson Co. purchased it. In the same transaction, Thompson Co. entered into a settlement agreement (not of record) which, besides accomplishing the sale of the stock to Thompson Co., allegedly contained several provisions: 1) that Lincoln dismiss its counterclaims[9] against Thompson Co., 2) that Lincoln consent to a judgment against it in the amount of $126,325.89,[10] and 3) that Lincoln cease doing business.

After the purchase of Lincoln, the settlement agreement and consent judgment, Thompson Co. had statutory authority to bring the separate misappropriation count, previously brought under *Ga.Code Ann* §§ 22–714 and 22–715 which relate to actions against directors for misappropriations of funds. Although these statutes authorize only certain parties to sue, the limited number includes shareholders, the corporation itself, and judgment creditors. Thompson Co. sued as a judgment creditor. *See* note 2 *supra*. Thompson Co. alleged that at the time of the sale of the loans Lincoln was insolvent, making the directors fiduciaries holding assets for Lincoln's creditors. Appellants allegedly violated their fiduciary duty by not paying the $27,305.30 in accord with the agreement between Lin-

---

**8.** Although the written agreement establishing appellee's sale of one million dollars in GNMA securities specified December 1 as the settlement date, it appears undisputed that the specification of this date was intended by neither party, and was thus the product of a mutual mistake.

**9.** The counterclaims included a 10b–5 claim, a Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, claim, and a state law fraud claim.

**10.** This figure was determined by adding the $2,500 commission to the debt on the GNMA contracts.

coln and Thompson Co.; this violation gave rise to a liability under § 22–714. Appellee further alleged that certain distributions the appellants made to themselves while Lincoln was insolvent made appellants liable under § 22–715(a)(1). The distributions at issue concerned the $100,000 certificate of deposit and certain of Lincoln's real estate; the alleged violation was that the directors made the distributions while the corporation was insolvent, a violation of § 22–511(a) and thus of § 22–715(a)(1) which prohibits distributions in violation of § 22–511, among other sections. Lincoln's $100,000 debt, arising when Lincoln borrowed $100,000 to purchase the certificate of deposit, became a personal debt of the appellants. In March of 1976, appellants used the certificate of deposit to discharge the debt, effectively converting $100,000 of corporate property to their own use.[11] Appellee presented evidence that Lincoln was insolvent at the time of conversion. Furthermore, Thompson Co. alleged that while Lincoln was insolvent, real estate belonging to Lincoln was transferred to appellants' wives, also in violation of § 22–715(a)(1).

As noted, based on the above claim, Thompson Co. as a judgment creditor sued appellants for the same $123,825.89 debt plus the $2,500 commission.

At trial, the state fraud claim was dismissed and the contract claim was effectively dropped. The judge directed a verdict for appellee on the misappropriations claim. The jury returned a verdict for appellee on the 10b–5 claim. Under the judgment, on both counts appellants were jointly and severally liable for $126,325.89. From this judgment, appellants appeal.

## II. Issues

Primarily, appellants raise the following issues on the 10b–5 claim:

1) Whether appellee's announcement the first day of trial that it would not present evidence on the 10b–5 claim constituted a dismissal of the claim.

2) The requirements of a due diligence defense.

3) The requirements for liability under the controlling person doctrine.

4) Whether an extreme form of recklessness suffices as the required scienter under 10b–5.

5) Whether the 1933 Act requires contracts to buy and sell GNMA securities to be registered.

6) Whether the court erred in the amount of the judgment on the 10b–5 claim.

7) Whether appellee proved the debt and thus damages.

Appellants raise numerous other issues relating to the misappropriations claim. *Inter alia*, they challenge rulings of the court:

1) That the return of a *nulla bona* on appellee's judgment against Lincoln was not necessary for appellee to recover from appellants under the misappropriation count.

2) That Lincoln was insolvent at the time of the alleged misappropriations, a requirement for recovery under the misappropriation count.

## III. 10b–5 Claim

### 1. Abandonment of the 10b–5 Claim

■ Appellants' first claim is that appellee dismissed its 10b–5 claim with prejudice. On the morning of the first day of trial, at an unrecorded conference to modify portions of the pretrial order, appellee an-

---

**11.** The $100,000 loan was originally taken out by Lincoln on August 8, 1975. Lincoln renewed the note on November 10, 1975. But on January 30, 1976 the appellants and Murphy, the fourth principal, made the note a personal one. On February 3, 1976, the note was once again renewed but in an unclear manner. Partridge and Murphy signed the note, and all four principals signed as guarantors; although the note was not in Lincoln's name, the note had the corporate seal on it. The principals then used the CD to pay off the note. The issue disputed at trial was whether the final note was a personal or corporate one. The judge in directing his verdict apparently found it a personal one. In light of our disposition *infra*, we need not reach this question. But we do observe that if the final note was a corporate one, then the execution of that note was an impermissible distribution since it satisfied the debt created by the personal note.

nounced it would pursue only the misappropriation of corporate assets claim. Later that day, at a formal discussion on the record of this "abandonment," appellants' contention that the abandonment would constitute a dismissal of the 10b–5 claim with prejudice by appellee was disputed. The judge's statement in response is unclear.

At the beginning of court the following day, appellee announced it had decided to present evidence on the 10b–5 claim. Appellants objected on the ground that the appellee had dismissed the 10b–5 claim with prejudice under Fed.R.Civ.P. 41(a). Alternatively, appellants argued that the appellee had amended its pleading to delete the 10b–5 claim and that it would be an abuse of discretion to allow a subsequent amendment to revive the 10b–5 claim. The judge ruled against the appellants and explained his statement of the previous day: he had concluded that the purported abandonment had not been a dismissal with prejudice, but rather an announcement that appellee would not present evidence on this claim. Appellants appeal this ruling on the grounds on which they objected.

We can dispose of the Rule 41(a) dismissal argument systematically.[12] Rule 41(a) provides:

**(a) Voluntary Dismissal: Effect Thereof.**

(1) *By Plaintiff; by Stipulation.* Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the ac-

tion. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

(2) **By Order of Court.** Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon him of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

Here, there was not a stipulation of dismissal with or without prejudice under 41(a)(1), for the parties had not reached an agreement on dismissal at any time. Nor was there a voluntary dismissal without prejudice under 41(a)(1): the defendant had answered. Finally, if appellants are relying on a judicial order under 41(a)(2), the judge's statement does not support appellants' contention.[13] The judge's statement was not an order, but simply his interpretation of what had occurred.

The issues are practically identical with regard to appellants' assertion that the abandonment constituted an amendment of the pleadings. Fed.R.Civ.P. 15(a) provides:

**(a) Amendments.** A party may amend his pleading once as a matter of course at any time before a responsive pleading is

---

**12.** One question not addressed by appellants is whether a particular claim can be dismissed with prejudice under Rule 41(a) or whether Rule 41(a) only applies to all counts. There appears to be at least some doubt on this question. *Compare Terry v. Pearlman,* 42 F.R.D. 335 (D.Mass.1967) with *Etablissements Neyrpic v. Elmer C. Gardner, Inc.,* 175 F.Supp. 355

(S.D.Tex.1959). However, we need not reach this question.

**13.** Although the judge's statement is ambiguous, the discussion the following day makes clear that he understood appellee was not dismissing the count, but simply announcing he would not introduce evidence on it.

served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Since appellants had answered, the abandonment could not have been an amendment as of right. The parties reached no agreement, so there could not have been an amendment by agreement. Finally, the judge in his statement did not contemplate an amendment of the pleadings.

Essentially what happened was that appellee made an announcement that it would not present evidence on the 10b–5 claim. If this had been incorporated into the pretrial order,[14] it could have had the effect of a dismissal with prejudice, as ordinarily a pretrial order is binding.[15] *See Thrash v. O'Donnell*, 448 F.2d 886 (5th Cir. 1971). Thus, appellee would have been precluded from presenting evidence on the 10b–5 claim, and since the count had not been dismissed, it would have been considered tried at the conclusion of the case. Obviously, the appellee would have lost for not carrying his burden. Here, however, the judge interpreted the announcement as just that, an announcement; there was no amendment of the pretrial order (*see* note 14 *supra*). Accordingly, we find no abandonment of the 10b–5 claim.

The appellants next contend "[t]he instructions to the jury that the court was permitting the Plaintiff to go forward on

the fraud charge gave added weight to [this claim and] . . . confused, misled and prejudiced the jury." We need not reach this question since appellants did not make a timely objection at trial. On the contrary, appellants were asked prior to the instruction if they would object to precisely the type of instruction given. They did not object. Instead, they waited to object until after the judge addressed the jury, at which time they moved for mistrial. Since no miscarriage of justice will result from our refusal to consider this ground, we decline to pass on it. *Delancey v. Motichek Towing Service, Inc.*, 427 F.2d 897 (5th Cir. 1972); *Patton v. Archer*, 590 F.2d 1319 (5th Cir. 1979).

### 2. *Due Diligence*

In order to recover under 10b–5, the plaintiff is required to exercise due diligence in investigating defendant's representations. *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir. 1977). Appellants contend that the trial court made several errors with respect to proof of appellee's due diligence in its investigation of Lincoln. Their first contention is that the following instruction was erroneous:

[T]here would still be a question as to whether or not the Plaintiff intentionally refused to investigate the false statements, in disregard of a risk known to the Plaintiff, or so obvious that the Plaintiff must have been aware of it, and so great as to make it highly probable that harm would follow.

Now, with regard to this issue, that is an issue referred to as due diligence. The burden is on the Defendants to prove by a preponderance of the evidence that the Plaintiff intentionally or wrecklessly [sic] disregarded known facts or facts that should have been known to him. The law imposes no greater standard of care on the Plaintiff than it does on the

---

14. The judge indicated at first that the announcement would be incorporated in the pretrial order, but in the discussion immediately following, as appellee's intent became clear, the judge implicitly retracted this.

15. Even if the statement had been incorporated into the pretrial order, it could be deleted subsequently if adhering to it would create manifest injustice. *See, e. g., Bettes v. Stonewall Insurance Co.*, 480 F.2d 92 (5th Cir. 1973). We do not reach this question.

Defendants. Thus, if you find that there were misrepresentations by Mr. Partridge, but that the Plaintiff did not have equal access to the information available to the Defendants or had not acted more wrecklessly [sic] than the Defendants, then the Plaintiff would have acted within a sufficient degree of care and would not be barred from recovery.

Appellants claim it was error to place the burden of proving the lack of due diligence on them: the burden should have been on appellee to prove due diligence. Presley also contends that the charge misstated the due diligence standard under *Dupuy*.

Under the case law, due diligence is an *element* of a 10b–5 cause of action, discussed in the same manner as scienter or misrepresentation. *Paul F. Newton & Co. v. Texas Commerce*, 630 F.2d 1111 (5th Cir. 1980); *Dupuy; Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100 (5th Cir. 1970). *Newton* requires "that the plaintiff show he acted with due diligence." *Newton* at 1122. *Dupuy* at one point notes that another case "reversed the burden of proof on the due diligence issue . . . [I]t made the . . . question an affirmative defense." *Dupuy*, at 1017–18. Thus, it is clear that due diligence is an element the plaintiff must prove, so the charge was erroneous.

Once more, however, appellants failed to object to the instruction. The only objection which possibly could be construed as raising the issue is the first sentence of the following, if read in isolation:

I do not believe that . . . Dupuy authorizes [and] I do not believe that it should be that the law authorizes a charge that there must be a showing that Plaintiff intentionally refused to investigate. I don't believe that the law requires that the Plaintiff act intentionally in that regard, regarding the matter of reliance . . .

In context, however, it is clear that the appellants' objection had nothing to do with the burden of proof, but rather went to the substantive content of the due diligence rule, i. e., whether an "*intentional* refusal to investigate" standard is stricter than the recklessness standard appropriate in this case.[16] The objection made did not bring the burden of proof issue to the trial judge's attention so as to enable him to make a correction—the purpose of the requirement that objections be made at trial. *United States v. Spiegel*, 604 F.2d 961, 970 (5th Cir. 1979). Thus, the plain error rule applies.

The leading case on the applicability of the plain error rule to an erroneous burden of proof instruction is *Sheppard Federal Credit Union v. Palmer*, 408 F.2d 1369 (5th Cir. 1969). *Sheppard* holds that:

[b]urden of proof is always of major importance and, in this case where the evidence was close . . ., it was crucial . . . . On these facts we cannot say that proper instructions would not have altered the outcome in some substantial way . . . . [T]he evidence was closely divided, . . . and a jury could reasonably decide either [way] . . . . Accordingly, we are of the opinion that the district court's erroneous charge on burden of proof resulted in a miscarriage of justice.

*Sheppard*, at 1372–73. We believe *Sheppard* should be read narrowly and limited to those instances where the evidence is very close. Otherwise, the plain error rule in this context would be no more than a restatement of the harmless error rule under which the test is whether there is a reasonable likelihood that a substantial right of the appellant's was affected by the error. *Johnson v. William C. Ellis & Sons Iron Works*, 609 F.2d 820 (5th Cir. 1980); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276 (5th Cir. 1976). (Using the same test would hardly encourage litigants to make their

---

**16.** *Dupuy* implicitly held that the language used in the first quoted paragraph stated the appropriate recklessness standard. (*Dupuy* applied this standard even though the defendant's misrepresentations were held "intentional" (but see note 32 *infra* on how literally to interpret the word "intentional").) The due diligence standard used in the second quoted paragraph is actually too strict on the plaintiff. We need not discuss this issue further as it was not a ground of appeal.

objections at trial; *see generally Spiegel.*) Where the evidence is very close, there is more than a reasonable likelihood, there is a substantial likelihood that a substantial right of the appellant was affected. The difference between the harmless error and plain error standards in the burden of proof context is thus the difference between a *reasonable* likelihood and a *substantial* likelihood.

█ Accordingly, we must evaluate the evidence on due diligence in light of the above plain error standard.[17] In evaluating the evidence under *Dupuy*, numerous factors beyond the intuitive ones are relevant: "existence of a fiduciary relationship, concealment of the fraud, opportunity for detection, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings .... Several courts have also considered whether the plaintiff initiated the stock transaction or pressured for a speedy resolution. *White v. Abrams*, 495 F.2d 724 (9th Cir. 1974); *Hafner v. Forest Laboratories, Inc.*, 345 F.2d 167 (2d Cir. 1965); *Kohler v. Kohler Co.*, 319 F.2d 634 (7th Cir. 1963)." *Dupuy* at 1016 (footnotes deleted).

Appellee's argument with respect to due diligence relies on the testimony of Hitchcock and Guy Thompson. Hitchcock testified that he formerly worked with appellant Partridge, that the latter had been in the mortgage banking business for more than twenty-five years, was a reputable person, and had an excellent reputation as a top producer of loans. He also testified that Partridge had ample time to obtain GNMA approval, that filling out the GNMA forms was rather routine, and that "ninety-nine percent" of putting together a GNMA certificate is producing the loans. He further stated that he knew Lincoln was FHA-approved which required minimum capital of $100,000. He also inspected the physical premises and confirmed that there was in fact a "going operation." Thompson testi-

fied that in this industry in light of the volume of transactions and the margin of profit, extensive investigation into a customer's business is not feasible. Moreover, as Hitchcock testified, to request company records to confirm what the company officials had said was not only not standard practice in the industry, but considered inappropriate.

On the other hand, appellants show that Hitchcock knew Partridge had never been in the brokerage end of the mortgage business and had no knowledge of dealing in GNMA securities; furthermore, Hitchcock was unaware of any track record of the other defendants. Appellants further assert that Hitchcock never received a financial statement from Lincoln. Finally, appellants note that Hitchcock, representing a highly sophisticated principal, actively pushed for the deal.

Based on these facts we must decide whether the evidence was so close that there is a substantial likelihood that given the proper instruction on the burden of proof with regard to due diligence the jury would have found that the appellee was sufficiently reckless in failing to further investigate the appellants' company to bar appellee's recovery under 10b-5. *See Dupuy* at 1020 (articulation of recklessness standard). We do not find such a substantial likelihood. The only way, realistically, the instruction could have been dispositive would be if the jury had determined that appellee should have, despite Hitchcock's knowledge of Partridge's ability and integrity, in some way corroborated the existence of the loans. The jury would have to have disbelieved appellee's statement that standard practice in the industry was not to corroborate. In the absence of any showing by either side on whether corroboration was reasonable and standard practice, the jury then could have decided that appellants had not carried their burden of proving appellee

---

17. The weight of authority indicates that the burden lies on the appellant to convince this court that an error to which a timely objection was made was not harmless. *Liner v. J. B. Talley & Co., Inc.*, 618 F.2d 327 (5th Cir. 1980); *Flores v. Cabot Corp.*, 604 F.2d 385 (5th Cir. 1979); *but see Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 604 F.2d 950, 960 (5th Cir. 1979). Accordingly, the burden of showing manifest injustice should be on the appellants.

had not exercised due diligence. If the burden had been on the appellee, they might thus have found differently. Because the jury could have been relying on the loan misrepresentation, not FHA approval, to find 10b–5 liability, the instruction might have been crucial. This string of suppositions, while possible, is too tenuous to characterize the possibility of prejudice as substantial. Thus, the erroneous charge was not plain error.

■ Appellants raise two further issues with respect to due diligence. Appellant Presley maintains that the instruction on due diligence quoted *supra* did not properly state the substantive law. In context, the ground of appeal appears to be the trial judge's failure to instruct the jury that with respect to due diligence appellee's sophistication in business should be considered. Since, however, the standard applied was recklessness, a subjective standard, it was unnecessary to give such an instruction. Moreover, appellee Presley did not raise this objection at trial. *See Delancey; Patton.*

The final due diligence issue raised by appellants is that they were entitled to summary judgment, directed verdict, judgment notwithstanding the verdict, or a new trial due to appellee's insufficient proof of due diligence.[18]

The standard for reviewing the denial of a directed verdict or judgment n. o. v. was articulated in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969):

[T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion.... [I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

■ In accord with the above standard, it would be our duty to determine if there is substantial evidence which could reasonably support a verdict for the appellee. The relevant factors and evidence have been reviewed *supra* in the burden of proof discussion.

A reasonable jury could very well have found for appellee on those facts.[19] A jury could have found that appellant Partridge's ignorance of brokerage and GNMA securities was hardly relevant in light of the fact that the crucial part of selling GNMA securities is producing loans and that is the area in which Partridge was known to have expertise. The jury could have found that relying on an experienced producer with a good reputation was standard practice for firms like Thompson Co. A reasonable jury could have found that Hitchcock did receive a Lincoln financial statement and that the reason the statement did not reflect the loans was because the loans were too recent. Alternatively, the jury could have found Hitchcock never saw a financial statement, but that examination of a financial statement was unnecessary in light of

18. We initially should answer one point pressed by appellants Partridge and Andrews. They contend that under *Dupuy* the plaintiff's fault should be judged by a standard corresponding to the defendant's degree of fault. Thus, appellants argue, appellee should be judged under a negligence standard, since appellant Partridge was only negligent. We need not discuss appellants' interpretation of *Dupuy*. The jury found that appellant Partridge was at least reckless, so regardless appellee should not be judged under a negligence standard.

19. Our holding *supra* that the burden of proof was probably not the deciding factor does not necessarily decide this question; although we held that a reasonable jury would probably not have found the evidence close, this does not mean a reasonable jury could have found for appellee. It could be that a reasonable jury could only have found the evidence clearly favoring the appellants.

Partridge's reputation and assurances. A reasonable jury could further have found irrelevant Hitchcock's ignorance of the staff of Lincoln in light of a general practice to rely on the head of a company who is experienced and reputable. Finally, appellee's aggressiveness and expertise in the area are only factors to be considered in determining whether appellee's acts were reckless; they are not independent evidence of recklessness. In short, a reasonable jury could have found the appellee was not reckless.[20]

The standard at the trial level on a motion for a new trial is whether the verdict is against the clear weight of the evidence or will result in a miscarriage of justice. *United States v. Bucon Construction Co.*, 430 F.2d 420 (5th Cir. 1970). The standard of review of a denial of the motion is whether the trial judge abused his discretion. *Faircloth v. Lamb-Grays Harbor Co., Inc.*, 467 F.2d 685 (5th Cir. 1972). Since the jury had more than sufficient evidence on which to make the findings described above, we hold the district judge did not abuse his discretion in denying appellants' motion for a new trial.

### 3. *Controlling Person Doctrine*

Presley next contends that there was no evidence that he had the requisite scienter for individual liability under 10b–5 and that as a matter of law he was not a controlling person; thus, the trial judge's failure to grant a directed verdict for Presley was error, as was the instruction that Presley was a controlling person as a matter of law. Finally, even if Presley was a controlling person, he was entitled to a ruling that as a matter of law he acted in good faith, a defense under the controlling person doctrine.

We need not review the first issue, since the trial judge did not charge the jury that it could find Presley directly liable under 10b–5; the judge instructed the jury that they could only find Presley derivatively liable under the controlling person doctrine. After describing the standards for individual liability under 10b–5, the trial judge stated: "I have told you of the rules of law by which you are to determine whether Mr. Partridge is liable in this claim that I have previously given you." The judge continued: "There is, however, a second basis upon which each of the Defendants may be found liable under the 10b–5 claim ... [t]he controlling person [doctrine]."

The next issue is whether Presley was a controlling person as a matter of law.[21] Presley contends that to be a controlling person one must participate in the transaction which gave rise to the controlled person's liability and that this was not shown.

The controlling person doctrine is based on 15 U.S.C. § 78t(a):

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The standard for a controlling person is provided by Regulation, as cited in *Pharo v. Smith*, 621 F.2d 656 (5th Cir. 1980):

The term "control" ... means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

---

**20.** Appellants do not present any argument, nor are we aware of any, that appellee was less than diligent in assuming that Lincoln had $100,000 in assets due to the fact it was FHA-approved.

**21.** Although Presley did not object to the charge that Presley was a controlling person as

a matter of law, the motion for directed verdict sufficiently brought this to the trial judge's attention to excuse the lack of objection. *Cf. Sweeney v. United Feature Syndicate, Inc.*, 129 F.2d 904 (2d Cir. 1942) (full prior discussion of point excused lack of objection).

17 C.F.R. § 230.405(f) (1979). *Pharo*, at 670. Neither this definition nor the statute appears to require participation in the wrongful transaction. Fifth Circuit case law appears to follow the plain meaning of the statute in this respect. *See Newton* at 1119–20; *see also Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971) (on the same question under 15 U.S.C. § 77o, which under *Pharo* should be construed identically with § 78t(a) on the control issue). Lack of participation and good faith constitute an affirmative defense for a controlling person. *See Newton; see also Hill York;* [22] *but see Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880 (3d Cir. 1975). It is important to separate control from the good faith defense since the burden of proof with respect to the latter is on the defendant (*see Newton* at 1120; *see also Hill York* (77o); *Swenson v. Engelstad*, 626 F.2d 421, 428 (5th Cir. 1980) (77o); [23] *but see Rochez Brothers*), while the burden of establishing control is on the plaintiff. *Newton; Hill York* (77o); *Ayers v. Wolfinbarger*, 491 F.2d 8 (5th Cir. 1974) (77o); *see also Pharo*.

■ Having reviewed the basic elements of the controlling person doctrine, we must determine whether appellee was entitled to a ruling that as a matter of law Presley was a controlling person, a question which as just noted turns purely on control. Uncontroverted evidence showed that Presley was not only a 24% stockholder and an officer and director, but was apparently involved in the day-to-day coordination of the loan gathering. Is this the requisite control? [24]

We are not directed to any Fifth Circuit case with similar facts. We conclude, however, that this evidence established that Presley had the requisite power to directly or indirectly control or influence corporate policy. *See Safeway Portland Employees' Federal Credit Union v. C. H. Wagner, Jr. Co., Inc.*, 501 F.2d 1120 (9th Cir. 1974) (summary judgment against two of three directors affirmed on the grounds that each was one of three directors—the third director was not a defendant); *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967) (ability to influence is sufficient); *Dyer v. Eastern Trust and Banking Co.*, 336 F.Supp. 890 (N.D.Maine 1971) (prima facie case made out when defendant shown to be one of 12 active directors controlling corporation); *cf. Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880 (3d Cir. 1975) (ability to influence is relevant).

The next question is whether Presley established a good faith defense, a question which was submitted to the jury. Our research has revealed three Fifth Circuit cases on what constitutes a good faith defense. In each, the question asked was whether the controlling person "failed to establish, maintain or diligently enforce a proper system of supervision and control." *Paul F. Newton & Co. v. Texas Commerce*, 630 F.2d 1111, 1120 (5th Cir. 1980) (action against brokerage company for acts of broker); *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187 (5th Cir. 1979), *modified on rehearing*, 611 F.2d 105 (5th Cir. 1980) (sale by agents of rental property); *DelPorte v. Shearson, Hammill & Co.*, 548

---

**22.** As noted, *Pharo* held that § 78t(a) and § 77o should be given the same interpretation on the question of control. Whether this is true of the burden of proof on the good faith or lack of knowledge defense as well as control was not made clear.

**23.** Although the defense under § 77o is substantively different, we are not aware of any reason the burden of proof should be different, especially since the sentence structure of the two statutes is similar. Other circuits follow the natural reading of the statute and hold, as we do, that under § 78t(a) the burden of proving good faith is on the defendant. *See Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975) (implicit); *SEC v. First Securities Co.*, 463 F.2d

981 (7th Cir. 1972). Furthermore, it makes sense that the burden would be on the defendant, for, as discussed further *infra*, there would be little reason for the controlling person provision unless it differed in some meaningful ways from the standards for noncontrolling person liability.

**24.** *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187 (5th Cir. 1979) is ambiguous on whether "effective day-to-day control" is required. *See* note 25 *infra*. If it is, we hold that Presley had enough of that control under the case law from other circuits surveyed in the text.

F.2d 1149, 1154 (5th Cir. 1977) (action based on broker's violations). These cases, however, do not end our inquiry, for two further questions persist. First, is this standard generally applicable or should it be limited to the facts of the three cases? Second, is any state of mind required with respect to the failure of supervision, i. e., would a controlling person be liable for negligently failing to establish a system? For reasonably failing to establish a system? For recklessly failing? None of the cases discussed this point, but we decline to assume that the lack of discussion indicates that no particular state of mind is necessary, especially in light of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), discussed *infra*.[25]

█ The first question need not detain us long. Clearly, there are factual situations where the above standard makes little sense, such as ours. Presley was a controlling person of Lincoln which was liable due to Partridge's acts. Presley could not have supervised Partridge; Presley probably could not have effectively established a system which would have done so. But Presley could have done other things. Presley could have exercised his power in the day-to-day administrative matters to minimize the chance of a 10b–5 violation by Partridge. Presley also could have used his power to influence Partridge or to attempt to monitor Partridge's acts and act appropriately where Partridge had erred. Essentially, we do no more than state the obvious. The test of whether the controlling person has done enough to prevent the violation depends on what he could have done under the circumstances.

The more difficult and important question is whether there is liability when the controlling person's failure to do what he should have done is negligent or reckless.

The Supreme Court has spoken on the meaning of good faith. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Court gives the controlling person section as an example of a provision of the 1934 Act which "contains a state-of-mind condition requiring something more than negligence." *Ernst* at 209 n.28, 96 S.Ct. at 1838–1839 n.28.

█ *Ernst* thus makes clear that a negligence standard is inappropriate. The question then becomes: is recklessness sufficient to give rise to liability? The Third Circuit, in *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880 (3d Cir. 1975), requires that the plaintiff prove the controlling person's "culpable participation." *See also Gordon v. Burr*, 506 F.2d 1080 (2d Cir. 1974); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761 (3d Cir. 1976). Culpable participation is further defined, in the case of inaction, as the intentional furthering of the fraud or preventing of its discovery. *Rochez* at 890. On the other hand, the Fourth Circuit, in *Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388 (4th Cir. 1979), notes that under *Ernst* the good faith standard requires more than negligence, then *Carpenter* holds that in addition to intentional furthering of the fraud a failure to supervise can give rise to liability, thus implying that recklessness can be enough. Although the Fifth Circuit cases neither discuss *Ernst* nor distinguish their test from intentional violations, they should probably be read as is *Carpenter*,[26] since liability based on a failure to supervise suggests recklessness (or negligence in other contexts), not intent.

We hold the recklessness standard appropriate. As noted, Fifth Circuit precedent is most consistent with such a holding. Other factors also indicate recklessness should be enough. It would be anomalous to require intent under the controlling person doc-

---

**25.** *Cameron* finds not liable one defendant director who was "without effective day-to-day control and without knowledge [of the violation]." *Cameron* at 195. The court does not say which factor is determinative or whether both are necessary. Nor does the court define "without knowledge," which might or might not describe reckless behavior, depending on

the definition of knowledge and of recklessness in this context. Thus, we decline to draw any guidance from this language.

**26.** We review the other circuits only because the Fifth Circuit cases do not directly address our question.

trine, while holding noncontrolling persons liable for severe recklessness. *See Securities & Exchange Commission v. Southwest Coal & Energy Co.*, 624 F.2d 1312 (5th Cir. 1980); *Croy v. Campbell*, 624 F.2d 709 (5th Cir. 1980) (both cases' holdings that a severe form of recklessness gives rise to liability are discussed *infra* ). Furthermore, what would be the purpose of the controlling person provision if intent were required— the provision would hardly make anyone liable who would not be so otherwise. Admittedly, the shift of the burden of proof to the defendant would make the controlling person provision somewhat meaningful, but not significantly so. Under our holding, the degree of recklessness required for liability under the controlling person doctrine is less than for noncontrolling persons under *Southwest Coal* and *Croy*, which spoke of a severe form of recklessness. *See* discussion *infra*. This difference makes the addition of the controlling person provision more meaningful. Finally, had Congress meant to require intentional misdoing, we assume it would have done so explicitly.

■ We hold therefore that the burden on the controlling person is to establish that he did not act recklessly in inducing, either by his action or his inaction, the "act or acts constituting the violation" of 10b–5.[27] Or, in the terms used *supra*, the question is whether the defendant acted recklessly in failing to do what he could have done to prevent the violation.[28]

■ Our next task is to analyze the evidence in light of this standard. Presley presented no evidence to refute the allegation that he acted recklessly with respect to Lincoln's misrepresentation (through Par-

tridge) of the amount of loans Lincoln had. This lack of evidence alone is sufficient to sustain the judgment against Presley, since he had the burden of showing good faith. There is no evidence that Presley ever attempted to influence or monitor Partridge's actions. The only evidence produced showed Presley asserted to Partridge that Lincoln had more loans than it actually did.[29] If Presley made this false assertion intentionally or recklessly—which he did not refute—this alone would constitute the requisite recklessness, unless Presley could show, again which he did not, that he had no idea that Lincoln, in the business of marketing loans, would be marketing based on his estimation. Thus, the jury's verdict on this point clearly was not so unreasonable that we should set it aside.

### 4. *Scienter*

Appellant Presley challenges the following instruction:

> [A] person who makes a statement with wreckless [sic] disregard of the truthfulness of the statement *and* with conscious purpose to avoid learning the truthfulness of a statement, is deemed to have knowledge of the statement and its truthfulness or lack thereof. (emphasis added)

Presley contends that this instruction on the liability of the principal, Lincoln, was error under *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 678 (1976).[30] *Ernst* rejected negligence as the basis for a 10b–5 claim but left open the question whether under special circumstances, recklessness could be sufficient. Presley argues that it was error not to let the jury determine whether such special circumstances existed that a reck-

---

**27.** Although the statute requires that a controlling person act in good faith *and* not induce the violation, it would not be sensible to read the statute literally to make an indirect inducement which is reasonable (e. g. a failure to personally supervise constantly) give rise to liability. We read the statute to require the controlling person to show that any inducement was in good faith, i. e. not reckless.

**28.** For a discussion of the content of the recklessness standard, *see* note 33 *infra* and accompanying text.

**29.** As discussed in note 7 *supra*, there was a dispute as to the amount by which Presley's representation to Partridge exceeded the actual loans in progress figure. But regardless of whom is believed, the difference between fact and fiction was substantial.

**30.** The relevancy of Presley's argument relates to the jury's implicit finding that Lincoln, through Partridge, violated 10b–5, a requisite to finding Presley liable as a controlling person.

lessness standard was appropriate under 10b–5.[31]

■■■■■■ Again, appellant Presley failed to object at trial to this instruction; thus, we need not consider this ground unless otherwise there would be a miscarriage of justice. *Delancey; Patton.* We hold there would be no such miscarriage of justice,

especially since here the charge, even if objected to, would not be grounds for reversal. *Southwest Coal* (implicit holding) and *Croy* are authority that severe recklessness is sufficient to prove scienter in a 10b–5 action. Even if these decisions were not considered binding, we hereby adopt this standard as the Fifth Circuit rule.[32]

**31.** Presley does not argue that a knowing misrepresentation would not constitute scienter.

**32.** We are aware that *Croy* relied on *Broad v. Rockwell International Corp.*, 614 F.2d 418 (5th Cir. 1980), *rehearing en banc granted*, 618 F.2d 396 (5th Cir. 1980), a vacated case. *See Dwoskin v. Rollins, Inc.*, No. 78–3655, 634 F.2d 285 at 290 n.1 (5th Cir., filed Jan. 16, 1981). Even, however, if *Croy* were undercut by *Broad* having been vacated, the implicit holding in *Southwest Coal* is authority. *Southwest Coal* involved an SEC action, but the Supreme Court has recently held that scienter is required in such actions, a question left open in *Ernst. Aaron v. SEC*, —— U.S. ——, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (the Court also refuses to decide whether recklessness can constitute scienter under 10b–5). *Southwest Coal* implicitly interprets *Aaron* to require the same scienter for SEC and non-SEC actions. (We also do not feel *Southwest Coal's* citation of *First Virginia Bankshares v. Benson*, 559 F.2d 1307 (5th Cir. 1977), a case *Croy* indirectly said only intimated recklessness would be enough, undercuts *Southwest Coal's* holding. We reject such a tenuous basis for undercutting an opinion.)

We further note that *Croy* and *Southwest Coal* are not in conflict with recent decisions such as *Pharo* or *Cameron* which speak only of intent. As noted in *Ernst*, recklessness is in some contexts a form of intentional behavior. Under our holding, it is so under 10b–5. Thus neither *Pharo* nor *Cameron* is inconsistent with *Croy* or *Southwest Coal.*

As noted in the text, even were *Croy* and *Southwest Coal* not binding precedent, we would adopt the same severe recklessness standard for the following reasons. First, the holding that recklessness is enough under 10b–5 is in line with the other circuits and with the consensus of the commentators; furthermore, the other circuits which address the question articulate the same recklessness standard applied in *Croy* and *Southwest Coal* (although they do not discuss whether this is an extreme form of recklessness). *See IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980) (the "generally" qualification refers to aiding and abetting); *Coleco Industries, Inc. v. Berman*, 567 F.2d 569, 574 (3d Cir. 1977); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir. 1979); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir. 1977); *Nelson v. Ser-*

*wold*, 576 F.2d 1332, 1337 (9th Cir. 1978); Metzger & Heintz, *Hochfelder's Progeny: Implications for the Auditor*, 63 Minn.L.Rev. 79 (1978); Bucklo, *The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder*, 29 Stan.L.Rev. 213 (1977); Haimoff, *Holmes Looks at Hochfelder and 10b–5*, 32 Bus.Law. 147 (1976); Note, *Recklessness Under Section 10(b): Weathering the Hochfelder Storm*, 8 Rut.–Cam.L.J. 325 (1977).

We also observe two primary substantive reasons supporting our holding that recklessness should be sufficient to give rise to liability under 10b–5. First, Rule 10b–5 should be liberally construed to effectuate the purposes of the 1934 Act. *See, e. g., Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance v. Bankers Life and Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Although *Ernst* found this principle ineffective to make negligence the standard, that holding was based in large part on the fact that the language of § 10(b) is inconsistent with a negligence standard. The language of § 10(b), however, is not inconsistent with a recklessness standard; the language suggests common law fraud under which recklessness is enough. *See* discussion *infra.* Without this *Ernst* problem, the liberal construction principle becomes particularly appropriate to the issue before us. It is usually difficult for the plaintiff to prove more than that the defendant must have known about the misrepresentation or omission and its potential harm. Such showing would prove recklessness, but is usually insufficient to prove specific intent. This would mean that the protections of § 10(b) would be minimal, which would hardly be consistent with the purpose of providing investors substantial protection from fraud. Thus, recklessness should suffice. *See Rolf v. Blyth, Eastman, Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978).

Furthermore, under common law fraud, the "interpretive source of securities law concepts" (*see Rolf* at 45; *Holdsworth v. Strong*, 545 F.2d 687, 693–94 (10th Cir. 1976) (and authorities cited therein)), recklessness is sufficient to satisfy the requirement of intent. *See, e. g., Rolf* at 46; *Sundstrand* at 1044. Such a rule probably springs from the same common sense approach to the realities of proving specific intent, thus further supporting the reasoning used *supra.*

Further, both *Southwest Coal* and *Croy* define the severe recklessness which would always suffice under 10b–5:

> [P]roof of recklessness would require a showing that the defendant's conduct was an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Southwest Coal* at 1321 n.17 (the court characterizes this degree of recklessness as "extremely high," supporting our assertion *supra* that only a severe form of recklessness gives rise to liability);[33] *Croy* at 715 (in context the court also seems to hold this recklessness standard to be a severe one).[34] A conscious purpose to avoid learning the truthfulness of a statement is an extreme departure from the standards of ordinary care. Although, one who makes a statement with reckless disregard for its truthfulness and with a conscious purpose to avoid learning the truthfulness may be slightly less culpable than one who must have been aware of a danger of misleading the buyer or seller, the difference is not significant. We thus find Presley's contentions meritless.

### 5. *Registration of the GNMA Contracts*

Appellants' next argument is that the district court erred in charging the jury that as a matter of law the agreements by both parties to sell GNMA securities need not be registered. The parties agree that under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, the GNMA's and the contracts to sell them are securities. The parties' argument focuses on whether the contracts fit within specified exemptions to registration of securities: the private offering exemption (15 U.S.C. § 77d(2)) and the governmental exemption (15 U.S.C. § 77c(a)(2)). Under the latter, the sale of a GNMA security would be exempt; appellants claim that the contract to sell a GNMA security is an investment contract (*see* 15 U.S.C. § 77b(1)) which is not covered by the § 77c(a)(2) exemption.

We need not and should not reach the substance of this issue, for even if appellants were correct, our result would not be affected. As appellee points out, the Securities Act of 1933, designed only to protect buyers, gives only the buyer a right to damages or rescission due to a failure to file a registration statement. 15 U.S.C. § 77*l*. Thus, appellants cannot seek rescission or damages due to the first two transactions in which Lincoln contracted to sell appellee GNMA securities. Appellants, realizing this, make a unique argument. They maintain that appellee violated 15 U.S.C. § 77e(c) of the 1933 Act which provides:

> It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or *offer to buy* through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security ... (emphasis added)

Although the two substantive reasons we rely on here could possibly support a holding that ordinary recklessness is sufficient, we require the severe form of recklessness noted *supra* because it reflects *Ernst*'s emphasis on "intentional" conduct; as noted, the other circuits which have spoken use this standard.

**33.** The difference between this recklessness standard and the one applied *supra* in the controlling person context is a matter of degree. Under this standard, the plaintiff must prove the defendant "must have been aware of [the danger of misleading the plaintiff]." Under the controlling person standard, the test would be whether the defendant "was almost certainly aware of the danger." *Cf. Southwest Coal* at 1321 n.17 (degree of recklessness for scienter is extremely high, for it requires that the defendant "must have known of [the danger of misleading plaintiff]" rather than just having known the omitted or misrepresented facts).

**34.** The court observes that recklessness is enough relying on *Broad*. Then it states, "[*Broad*] also noted, however, that proof of recklessness would require" the showing quoted above. The inference is that the quoted requirements are in addition to the normal showing required to prove recklessness.

Appellants do not assert that under the statute they have a relevant remedy, probably because, as noted, there is none. But they assert that the above-quoted language must have some effect and that at least one effect should be to bar a buyer's recovery under 10b–5. We find no Court of Appeals authority on the meaning and effect of the above-quoted language. In *Brucker v. Thyssen-Bornemisza Europe N.V.*, 424 F.Supp. 679 (S.D.N.Y.1976), however, the court quoted commentator Loss approvingly:

> [T]he provision 'was originally inserted solely for the purpose of preventing *dealers* from making offers to buy from underwriters during the waiting period.' 1 Loss, *Securities Regulation* 212 (2d ed. 1961).

*Brucker*, at 690.

Loss' narrow reading of the clause makes sense. Under 15 U.S.C. § 77t, dealers can be enjoined from making offers to buy in violation of § 77e(c). Moreover, buyers/victims of 1933 Act and 1934 Act violations will not find themselves having violated § 77e(c) by having made an offer to buy.

The above reasoning disposes of appellants' unsupported theory that a violation of § 77e(c) should preclude a 10b–5 claim. As discussed, there was no violation of § 77e(c).

As for the latter two transactions in which appellee sold to Lincoln, Lincoln arguably could rescind or recover damages. We assume without deciding that since Presley's and Andrews' liability was derivative, they would have the right to argue that Lincoln should be able to rescind or recover damages and to derivatively benefit from the appropriate remedy. If Lincoln had the right to rescind, then appellants Presley and Andrews could claim that the offsetting contracts (Lincoln buying) are void which means appellee has not proved damages. If Lincoln had the right to damages, such damages could offset Presley's and Andrews' derivative liability.

Neither Andrews nor Presley made this 15 U.S.C. § 77*l* counterclaim in his answer. Moreover, neither the defendants nor Lincoln did or could tender the GNMA securities at issue, a requirement for rescission under 15 U.S.C. § 77*l*. *Moses v. Michael*, 292 F.2d 614 (5th Cir. 1961). Thus, Lincoln's only possible remedy would be for damages, but appellants did not prove that Lincoln suffered any damages due to the purchase from Thompson, a burden Presley must carry. The appellants' counterclaim under 15 U.S.C. § 77*l* therefore must necessarily fail without our reaching the question whether contracts to sell GNMA securities are exempt under the 1933 Act.

### 6. *Amendment of the Judgment*

■ Presley contends that the district court erred in amending the judgment on the securities claim. The jury awarded appellee $30,956 from each of the appellants. The court modified this judgment so that each appellant was jointly and severally liable for $126,325.89. Presley maintains that the district court thereby reexamined the facts found by the jury, a violation of the Seventh Amendment.

As pointed out by appellee, the district court should have provided that each appellant was jointly and severally liable for $123,825.89 which was what appellee had sought as damages on the 10b–5 claim. The jury clearly misunderstood the court's instructions and divided the total damages by four (the number of Lincoln principals) and assessed a one-quarter share against each defendant: $123,825.89 divided by four equals $30,956.47, which, rounded to the nearest dollar is the amount for which the jury found each defendant liable. That such an error occurred is so clear that it is not unlike a clerical error which the court can correct under Fed.R.Civ.P. 60(a);[35] the

---

**35.** Rule 60(a) provides:

    (a) *Clerical Mistakes.* Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

court was not reexamining the facts upon which the verdict was based. *Cf. Smith v. Philadelphia,* 173 F.2d 721 (3d Cir. 1949) (where it is apparent that the jury reversed awards on different claims, court can correct the error of the jury).

Presley is correct, however, that the court practiced impermissible additur (*see Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1934)) in making each defendant jointly and severally liable for $126,325.89. Had the jury determined total damages to be $126,325.89 and then divided this figure by four, there would be no reason for the jury then to subtract a small amount from each one-quarter share. The jury obviously found the total damage to be, as appellee had contended throughout the trial, $123,-825.89. The district court gives no reason for making the figure $126,325.89 instead of $123,825.89. In fact, in his charge to the jury, the district judge acknowledged that $123,825.89 was the maximum recoverable under the 10b–5 claim. It is apparent that the judge mistakenly included the commission ($2,500) and thus erred in making the judgment $126,325.89. We hold the defendants are each jointly and severally liable for $123,825.89.

### 7. *Proof of Damages*

■ Appellants further claim that the district court erred in denying appellants' motion for directed verdict on the 10b–5 count on the grounds that appellee failed to prove damages by failing to show the existence and amount of Lincoln's debt to appellee. (Appellants also claim that the district court erred in ruling on the misappropriations count that as a matter of law Lincoln owed appellee $126,325.89.) Unless this unpaid debt exists, appellee would not have demonstrated any damages flowing from appellants' 10b–5 violations.

The argument revolves around the significance of the following stipulations upon which appellee and the district judge relied:

1). On September 26, 1975 Mr. Herbert Partridge, on behalf of Lincoln, and Mr. Charles Hitchcock, on behalf of G. A. Thompson, entered into an oral agreement whereby Lincoln agreed to sell and G. A. Thompson agreed to purchase $1 million face amount Government National Mortgage Association securities with a coupon rate of 8½%, 30 year maturity, at a net price of $94⅜.

2). Mr. Hitchcock, acting for G. A. Thompson, sent a letter on September 26, 1975 to Mr. Partridge setting forth the terms of the above contract of sale entered into on September 26, 1975. On September 29, 1975 Mr. Partridge, acting for Lincoln, signed a copy of the letter agreeing to and accepting the terms of the contract, and returned the signed copy of the letter to G. A. Thompson.

3). On October 1, 1975 Mr. Partridge, on behalf of Lincoln, and Mr. Hitchcock, on behalf of G. A. Thompson, entered into a contract whereby Lincoln agreed to sell and G. A. Thompson agreed to purchase $1 million face amount Government National Mortgage Association securities with a coupon rate of 8½%, 30 year maturity, at a net price of $93⅝. At the same time, Mr. Partridge and Mr. Hitchcock, acting on behalf of their companies, entered into a contract whereby Lincoln agreed to sell and G. A. Thompson agreed to purchase $500,000 face amount Government National Association securities with a coupon rate of 8½%, 30 year maturity, at a net price of $93⅝.

4). On October 1, 1975 Mr. Hitchcock, acting for G. A. Thompson, sent two letters to Mr. Partridge confirming the terms of the contracts mentioned above. On October 3, 1975 Mr. Partridge, acting on behalf of Lincoln, signed the letters agreeing in accepting to the terms listed, and returned the letter to Thompson.

. . . . .

7). On October 30, 1975 Mr. Partridge, acting for Lincoln, and Mr. Hitchcock, acting for G. A. Thompson, entered into a contract whereby G. A. Thompson agreed to sell and Lincoln agreed to purchase $1 million face amount Government National Mortgage Association securities with a

coupon rate of 8½%, 30 year maturity, at a net price of $99⅝.

8). On October 30, 1975 Mr. Hitchcock, acting for G. A. Thompson, sent a letter to Mr. Partridge setting forth the terms of the above contract of sale entered into on October 30, 1975. On October 31, 1975 Mr. Partridge, acting for Lincoln, signed a copy of the letter agreeing to and accepting the terms of the contract, and returned the signed copy of the letter to G. A. Thompson.

9). On October 23, 1975 Mr. Partridge, acting for Lincoln, and Mr. Hitchcock, acting for G. A. Thompson, entered into a contract whereby G. A. Thompson agreed to sell and Lincoln agreed to purchase $1,500,000 face amount Government National Mortgage Association securities with a coupon rate of 8½%, 30 year maturity, at a net price of $98½.

10). On October 23, 1975 Mr. Hitchcock, acting for G. A. Thompson, sent a letter to Mr. Partridge setting forth the terms of the above contract of sale entered into on October 23, 1975. On October 27, 1975 Mr. Partridge, acting for Lincoln, signed a copy of the letter agreeing to and accepting the terms of the contract, and returned the signed copy of the letter to G. A. Thompson.

Appellants urge that alone these stipulations do not show the existence of a $123,825.89 debt from Lincoln to appellee. We agree, especially since the stipulations do not specify delivery dates: if the delivery dates for appellee's sales to Lincoln were a year in the future, the stipulations alone could hardly be evidence of a debt. We must affirm, however, if there is a sufficient basis in the record to sustain the judgment. *Stegmaier v. Trammell*, 597 F.2d 1027 (5th Cir. 1979). The record shows that the delivery dates for appellee's purchases matched the delivery dates for appellee's sales. We could affirm by saying that the inaction on the delivery dates should be seen as performance by both; thus, the difference in purchase price is owed. An even stronger ground for affirmance stems from the fact that it was undisputed at trial and in the briefs that the contract providing that appellee would sell GNMA securities to Lincoln was intended solely to "cancel out or 'cover' [Lincoln's] agreements to [sell to appellee]."[36] Essentially, a proper construction of the two contracts in light of the parties' intentions would show that appellee was, for $123,825.89, releasing Lincoln from an obligation Lincoln could not fulfill. We thus hold that the district judge was justified in denying appellants' motion for a directed verdict on the issue of damages.[37]

---

**36.** This quote comes from Presley's brief (at 6).

**37.** Appellants raise two further issues on the 10b–5 claim, which can be disposed of easily. First, appellants maintain that appellee's failure to submit requested instructions on the 10b–5 claim the first day of trial was deliberate and the judge's tolerance of such tardiness was an indication of bias, in light of the judge's insistence, pursuant to the pretrial order, that defendants' requested instructions on the other counts be submitted the first day. Appellants have not shown any prejudice from appellee's delay nor have they convinced us of the judge's bias.

Appellants also make several arguments with respect to the settlement agreement. First, they say it should have been admitted. If it had been admitted, they contend that it would have shown that Lincoln was not insolvent when the appellants withdrew funds, that appellee should be estopped from maintaining a derivative action since it rendered Lincoln insolvent after acquiring it, and the agreement

constituted an accord and satisfaction of all debts to appellee, the last of these being relevant to both the state law and 10b–5 claims. We need not reach the substantive issues since we hold that the district court did not abuse its discretion in refusing to allow the settlement agreement to be introduced on the grounds that it was beyond the scope of sur-rebuttal. Appellants offered the agreement primarily for the financial statement it contained which would tend to show Lincoln was not insolvent at the time appellants withdrew funds—a proper sur-rebuttal. But appellants would not introduce this statement alone, insisting on introducing the entire agreement which had a significance beyond the proper scope of sur-rebuttal; for instance, it was relevant to appellants' currently asserted affirmative defense of estoppel. The appellants do not provide us with any argument on why, under the case law, the district judge abused his discretion in refusing to admit the settlement agreement.

## 966

### IV. *Misappropriation of Assets*

#### 1. *Nulla Bona*

■ Presley argues that a requisite for a judgment creditor's recovery against a corporate director on a corporate debt is not only a valid judgment against the corporation, but also the return of a *nulla bona* against the corporation. Appellee concedes that no *nulla bona* was returned against Lincoln.

Both parties rely on *Emhart Corporation v. McLarty*, 226 Ga. 621, 167 S.E.2d 698 (1970). *Emhart* does initially state that an entry of *nulla bona* is required. It then relaxes this requirement:

> Since equity will not require a useless thing, the allegations of the petition as to judgment being obtained against the corporation together with the allegations of the prior conveyance of all the corporate property is tantamount to an allegation of an entry of nulla bona on an execution.

We find no allegations in the complaint or in the record that all corporate property had previously been conveyed. We will assume, *arguendo*, that sufficient proof of the absence of corporate assets on which to levy will satisfy the *Emhart* test.

The next question is whether Lincoln had any assets which could be levied on; Presley contends that as a matter of law appellee's proof was insufficient to show the absence of assets. Appellee relies on testimony that when appellee acquired Lincoln,[38] it had a negative value, i. e., "there were more liabilities than assets." However, the fact that Lincoln had a negative net worth does not mean Lincoln did not have assets which could be levied on. Appellee's brief does indicate that the settlement agreement would have shown Lincoln had negligible assets, but as the settlement agreement was not admitted (*see* note 37 *supra*) we find no competent evidence of the absence of assets. Because appellee failed to carry his burden of proof on this essential issue, we reverse without reaching any other issues on the state law count and instruct the district court to enter a verdict for appellants on the state law claim.[39]

### V. *Conclusion*

In summary, we affirm the judgment as modified on the 10b–5 count and reverse the judgment on the misappropriations of corporate assets claim. We remand to the district court to enter judgment for appellee in the amount of $123,825.89 on the 10b–5 claim and to enter judgment for the appellants on the misappropriations claim.

AFFIRMED IN PART, REVERSED IN PART. REMANDED.

---

**38.** The settlement agreement was reached at this time.

**39.** Our disposition makes unnecessary any consideration of a question not raised by either party as to whether Thompson Co. could, under *Davis*, bring a direct action as a judgment creditor. *See* note 2 *supra*.